# WILLIAM McELVAIN v. DEBORAH McELVAIN et al., Appellants.

### Division One, December 24, 1902.

1. **Agreement to Adopt Child:** PERFORMANCE: PROOF. Even if an oral agreement to adopt an illegitimate child, made with the minor child himself without the intervention of some one who stands *in loco parentis*, could be enforced on the ground that there has been a full performance of the contract on the child's part, the evidence to establish such an agreement must be clear and convincing.

2. ————: ORAL TESTIMONY: LETTERS. A statement by two illiterate witnesses that the child's father, who was a man of intelligence and some education, had, forty or more years previously, when they were not over twelve or fourteen years old, gone to a neighbor's to get a magistrate to write to his illegitimate son a letter which he dictated, and in which he stated to the child, then about fifteen years old, that, if he would come and live with him he would treat him as a child and in a division of his estate he should share with his other children, is worthless as evidence to establish an agreement to adopt such child and thus make him his heir, or that he would by his will make him an equal legatee with the rest.

3. ————: ————: ————: SUGGESTION TO ILLITERATE MIND. The idea of going to an esquire to get a letter written is the suggestion of an illiterate mind, and quite natural to a witness who can not write.

4. ————: ————: RECALLING CONVERSATION. The testimony of a witness essaying to recall a conversation which occurred more than forty years previously, when the witness was not over twelve years old, by which it is attempted to establish a contract between an illegitimate child and his father to make him his heir or adopt him as his lawful child, is not the clear, cogent and convincing kind which the law requires for that purpose.

5. ————: ————: ————: TRUSTWORTHY: PROOF OF SPECIFIC CONTRACT. Even though such testimony may be trustworthy, yet the law requires it to be clear as to what the contract was. If it leaves to conjecture whether such illegitimate child was to be adopted, or provided for by will, or generously treated by his father during his life, it will not sustain a judgment admitting such child to a full share with the intestate's lawful children in his estate.

Appeal from Worth Circuit Court.—*Hon. P. C. Stepp,* Judge.

REVERSED AND REMANDED (*with directions*).

*Benson & Peery* and *Wilson & Phipps* for appellants.

(1)   The plaintiff's right to recover depends solely upon contract.   The petition proceeds upon this theory and states the contract and its terms with much particularity.   The plaintiff, being illegitimate, has no legal or equitable rights to any part of the estate of his father, unless he has established the express contract upon which he sues.   Bent v. Vrain, 30 Mo. 268; Dyer v. Brannock, 2 Mo. App. 432; Easley v. Gordon, 51 Mo. App. 637; R. S. 1899, secs. 2916, 2917, 4323.   (2) The evidence in cases of this character must be so clear, cogent and convincing, as to leave no reasonable doubt in the mind of the chancellor.   Berry v. Hartzell, 91 Mo. 132; Teats v. Flanders, 118 Mo. 660; Brownlee v. Fenwick, 103 Mo. 420; Murlock v. Murlock, 156 Mo. 440; Cherbonnier v. Cherbonnier, 108 Mo. 263; Curd v. Brown, 148 Mo. 92; Steele v. Steele, 161 Mo. 575. · (3) Acts of part performance must relate to contract.   Sitton v. Shipp, 65 Mo. 303; Phillips v. Thompson, 1 John. Ch. 131; Brownlee v. Fenwick, 103 Mo. 427; Rogers v. Wolf, 104 Mo. 9; Emmel v. Hays, 102 Mo. 195; Cherbonnier v. Cherbonnier, 108 Mo. 263.   (4)   Such unsatisfactory evidence as has been brought forward in this case is utterly insufficient to authorize a court of equity to grant specific performance.   It would be strange indeed if titles could be divested, or property rights disturbed, upon such vague, unsatisfactory and conflicting evidence as plaintiff relies upon.   Johnson v. Quarles, 46 Mo. 427; Cornet v. Bertelsman, 61 Mo. 127; Fanning v. Doan, 139 Mo. 411; Curd v. Brown, 148 Mo. 95; Murlock v. Murlock, 156 Mo. 440; Steele v. Steele, 161 Mo. 576.   (5)   Plaintiff received full

value of his services. There is no equity in plaintiff's case justifying specific performance of the alleged contract. Even though his evidence as to the making of the contract was of such clear, cogent and convincing character as to leave no doubt that it was entered into, still before plaintiff could compel specific performance it must appear that he would be injured by its non-enforcement; that it would operate as a fraud upon him unless it be enforced, and that it would be impossible to restore the plaintiff to his *status quo*. It is only upon this theory that a contract within the statute of frauds may be enforced on account of part performance. Nowack v. Berger, 133 Mo. 42; Teats v. Flanders, 118 Mo. 669; Lynn v. Hockaday, 162 Mo. 111. (6) Specific performance of a contract is not a matter of absolute right, but rests in the sound discretion of the chancellor, and the granting or refusal of such relief must depend on the facts and circumstances of each case. Veth v. Gierth, 92 Mo. 104; 2 Story Eq. Jur., secs. 769, 770; Sease v. Clev. Found. Co., 141 Mo. 496; Brown v. Massey, 138 Mo. 519; Hollman v. Conlon, 143 Mo. 369; Davis v. Petty, 147 Mo. 374. (7) Mrs. Deborah McElvain, widow of Andrew McElvain, deceased, was a competent witness to prove or disprove the alleged contract set up in the petition. The result of the controversy would not augment or diminish the estate; it would simply decide whether or not plaintiff is a distributee. Lynn v. Hockaday, 162 Mo. 111. (8) The supreme court will try the case *de novo*. This is a suit in equity. The evidence given on the trial, both by deposition and orally, is presented to this court *in haec verba*. The responsibility of determining the sufficiency of this evidence to sustain the allegations of plaintiff's petition and the decree rendered by the trial court, is now devolved upon this court; and it is not relieved of that responsibility by any conclusions to which the court below may have come. Alexander v. Alexander, 150 Mo. 598; Blount v. Spratt, 113 Mo. 48; Dalrymple, v. Craig, 149 Mo. 345.

*Aleshire & Benson* and *Kelso, Schooler & Kelso* for respondent.

(1)   Under the evidence in this case no question can arise but that the respondent fully complied with his agreement and performed all the services required of him under the contract.  It is true the evidence should satisfy the chancellor, not beyond a reasonable doubt, but to a satisfactory degree.   The fact that where all the witnesses appeared before the court, where he observed the manner of their testimony, and passed upon the credibility and reasonableness of the evidence and then makes a finding, it certainly must be of the character decribed in appellants' brief or such finding could not be made.   (2)   Where part performance, or rather, where entire performance, takes place between the plaintiff and defendant, this fact alone is the evidence to a large degree of the contract and is one of the attending circumstances which satisfies the court, in our opinion, that the evidence is satisfactory.   In this case Mrs. DeHart and J. N. Williams both testified absolutely as to the terms and agreement, and there is no evidence that in any manner tends to refute or destroy the force of their statement.   Appellants' evidence is of the negative character and of persons who did not hear the contract; and of persons to whom William McElvain did not tell the terms of the contract.  (3)   Parol contracts are valid under the law of Missouri, where there has been a performance of one of the parties on his part in accordance with the terms of the contract and agreement, and it is the settled law of this State that such contracts are enforcible in courts of equity, notwithstanding the statute of frauds.   Sharkey v. McDermott, 91 Mo. 652; Gupton v. Gupton, 47 Mo. 37; West v. Bundy, 78 Mo. 407; Anderson v. Shockley, 82 Mo. 250; Sharkey v. McDermott, 91 Mo. 652; VanDyne v. Vreeland, 12 N. J. Ch. 1; Davison v. Davidson, 2 Beasly (N. J.) 246.   A verbal agreement of this sort in case of part performance, will authorize a decree, giving that agreement full force and effect.

Sutton v. Hayden, 62 Mo. 112; Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37.   Where a man, in consideration of marriage of a woman to him, made an oral agreement or promise to adopt her infant child, and make him an equal heir with his own children, should any be born of the marriage, and the adopted son rendered such services to his stepfather as were usual from a child to a parent, and the stepfather by his will devised and bequeathed all his property to his three sons born of the marriage, except a small part of his estate devised to the children of his stepson, the latter upon the death of his stepfather, was entitled to one-fourth of the entire estate left by the testator, regardless of his devise to the stepson's children, and the court, in a suit by the stepson, for specific performance of the contract, properly decreed and ordered contribution from decedent's children. Nowack v. Berger, 133 Mo. 24; Sutton v. Hayden, 62 Mo. 101; Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Sharkey v. McDermott, 91 Mo. 647; West v. Bundy, 78 Mo. 407; Anderson v. Shockley, 82 Mo. 250; White v. Ingram, 110 Mo. 474; Teats v. Flanders, 118 Mo. 669; Healey v. Simpson, 113 Mo. 340.   (4) Some deference is due to the opinion of the trial judge before whom most of the witnesses personally appeared and testified, and to whom they were probably known. In such cases the court declines to interfere with the judgment unless it is manifest that it should have been for the other party.   Bank v. Murray, 88 Mo. 196; Fuchs v. Fuchs, 48 Mo. App. 23; Carney v. Carney, 95 Mo. 358; Davis v. Kline, 96 Mo. 401; Barrett v. Davis, 104 Mo. 549; Klieman v. Geiselmann, 45 Mo. App. 497.

VALLIANT, J.—This is a suit in equity to compel the defendants, who are the widow and children of Andrew McElvain, deceased, to admit the plaintiff to an equal share as one of the heirs in the partition and distribution of the estate of the intestate.

The substantial statements of the petition are to the effect, as follows:   That plaintiff was born in Illi-

nois in 1839; that he was the illegitimate son of Andrew McElvain who died intestate in Worth county, Missouri, in February, 1898, leaving the defendant Deborah, his widow, and the other defendants, his lawful children, heirs and distributees of his estate, valued at $35,000. That plaintiff lived with his mother in Illinois and Iowa until he was fifteen years old, when she died, after which he received a letter from his putative father "stating to him that if he would come and live with him that he, the said Andrew McElvain, deceased, would take the plaintiff into his family and treat him as his own child and share his property equally with the balance of his children; that afterwards the plaintiff and the said Andrew McElvain, deceased, entered into a contract and agreement, the terms of which were, that if the plaintiff would go to the home of the said Andrew McElvain, deceased, and live with and work for him, the said Andrew McElvain, deceased, and perform the duties of a child to a parent until plaintiff became of age the plaintiff should be treated the same as the balance of his children, and should share equally in all his property with the balance of his children, and be considered in all things upon an equal plane and footing with all his children, so far as the rights and privileges of said decedent's home was concerned, the same as his other children, and upon equal terms with all of his said children and should share equally with the children of the deceased in the final disposition of all of his property." That in consideration of the terms of the agreement the plaintiff went to the home of the deceased, lived with him as one of the family, and worked for him until the plaintiff was of age. The answer denies the allegations of the petition in relation to the alleged agreement; and avers that the intestate in his lifetime paid the plaintiff in property and money all that his services were worth. Reply, general denial.

The testimony for the plaintiff on the issue as to the contract set up in the petition consisted in the main of that of three witnesses, two first cousins of plaintiff

on his mother's side, and a half-brother on the same side.

The deposition of one of these on this point was to the effect that in 1856 or 1857, "along about that time," Andrew McElvain, who then lived in Worth county about a mile from where witness's father lived, came over to his father's house and asked Esquire Neal, who was there, to write a letter for him to his son the plaintiff, who was then a boy about thirteen years old living in Iowa, to come and live with him, as his mother was dead, and he had no home, and that he should share with the rest of his children; the letter was written as requested and witness heard it read. "It said he wanted Billy to come home and live with him. His mother was dead and he had no home and he wanted him to live with him. That is all I recollect about the letter." Within a few months after the letter was written the plaintiff came to the home of witness's father in Worth county, and the next day Andrew McElvain came to the house, and when he started home he said to plaintiff, "Well, Willie, you are coming home this evening are you?" and Willie said, " 'Yes, if it is all agreeable,' " and Uncle Andrew said, 'Come ahead,' " and plaintiff went that evening.

The testimony of another of these three witnesses as to the alleged contract was to the effect that in "1854 or 5 or 6, or it might have been later, I wouldn't say," the plaintiff was at witness's father's and Judge McElvain came there, and plaintiff and witness were called in the house, "and right there it was the contract was made between him and the boy, it was talked of there;" "Well, sir, he was asking the boy if he would go home and live with him, and the boy told him that he had become able to take care of himself and unless there was more in it than just board and clothes that he could earn his board and clothes any place, and Uncle Andy then told him that if he would go home and be as one of the other children, he should be as one of the other children, heir his property just the same when he was done with the property." The plaintiff went to the

McElvain home that evening, and lived there until he enlisted in the army in September, 1861.

The testimony of the half-brother bearing on the issue as to the contract, was, that in July, 1899, he was living in Mercer county, Missouri, and witness's father having recently died, witness went to his father's late home in Iowa, and in looking over some old papers of his father's, found a letter addressed to the plaintiff in care of witness's father, purporting to be signed by Andrew McElvain; it had the appearance of an old, worn and somewhat faded letter; witness read a portion of it, not all, and thinking it of no importance threw it on the floor and afterwards caused it to be burned with other papers deemed worthless; as to the contents of the letter the witness said: ''Well, the letter was addressed to William McElvain, he addressed him as his son, my dear son; says, 'I seat myself to write you a few lines to let you know that I am well and hope this may find you the same.' He says, 'William, I hope now, son, that you may come home and live with me and make your home with me.' He says, 'If you will come home and make your home with me I'll do the same part by you that I intend to do by the balance of my children.' Q. Anything further? A. No, I don't know that I read anything in particular further than that.''

The testimony of the two witnesses as to the letter that each spoke of was admitted over the objections of the defendants, that the foundation for secondary evidence had not been laid, and as to that referred to as having been found by witness among his father's papers, there was also no evidence tending to show that it was written by Andrew McElvain.

There was an effort on cross-examination to learn from the two witnesses who undertook to relate the conversations between Andrew McElvain and the plaintiff, their respective ages when the conversation occurred, but they were unable to give the information with proximate accuracy.. The impression left by their evidence on that point is that they were perhaps ten or twelve

years old at the time.   They appeared to have very little education; one of them signed the deposition by her mark.   She gives the date of the conversation she heard as the last of 1856 or the first of 1857; the other said it was 1854, or 5 or 6, or perhaps later.   Another witness for plaintiff, Mr. Dry, was of the opinion that plaintiff went to live at the McElvain home two or three years before the war, was not sure, it might have been as late as 1859; that Judge McElvain came to Missouri to live in 1855.   The further testimony for plaintiff tended to show that after he went to live in the McElvain home he worked on the farm and was treated as a member of the family and called Andrew McElvain father.   He enlisted in the Union army in a six-month's regiment in September, 1861, and never after that lived at the McElvain home.   There was a letter from the intestate to the plaintiff, dated October 3, 1887, in which the plaintiff was addressed as "my dear son."   This letter will be referred to again.

On the part of defendants the testimony tended to show that the plaintiff came to live at the McElvain home in 1859; he worked on the farm in the summers of 1859 and 60, and went to school in the winters, worked in the summer of 1861 until September and then enlisted in the army.   He married in 1862.   Andrew McElvain gave him 120 acres of land and some live stock.   There was a young man of about the same age named Hamilton who worked on the farm the same time plaintiff did, and was treated in the same manner, and when he left McElvain gave him the same quantity of land and stock.   While plaintiff was living on the farm he addressed Andrew McElvain and his wife by their given names; after he left he wrote to him and addressed him as "father."   During the time he lived on the farm and during the lifetime of Andrew McElvain no one in the family ever heard of the alleged contract.   After he left the farm in 1861 plaintiff never returned except on business, and Andrew McElvain for ten years prior to his death, which occurred in 1898, had not heard from him.   Andrew McElvain was a

man of intelligence and some education, attended to his own business, and wrote his own letters.

There was a finding and judgment for the plaintiff, admitting him to full share with the lawful children of Andrew McElvain, deceased, in his estate, from which judgment the defendants appeal.

I. It is not entirely clear from the petition itself what the contract was on which the plaintiff relies. That is, whether it was that Andrew McElvain during his lifetime would be as liberal to plaintiff in the disposition of his property as to his lawful children, or that he would adopt him and thus make him an heir, or that he would by his will make an equal distribution of his estate including the plaintiff.

The averments in the petition are vague on that subject and but for the concluding part of the statement that the plaintiff "should share equally with the children of the deceased in the final disposition of all of his property," there is nothing to indicate other than that he proposed during the time the plaintiff would live with him to be as generous to him as to his own children. And even the concluding clause leaves it in doubt, whether the alleged contract contemplated that the plaintiff was to be adopted or to be provided for by will. The petition states that plaintiff received a letter from the intestate proposing to plaintiff to come and live with him and that he would be treated as one of his own children and share with them in his property, but it does not state that that proposition was accepted, the letter appears merely by way of introduction, the petition expressly averring that "afterwards" the contract sued on was entered into.

Again: The petition does not allege that the contract was entered into by the intestate with some one capable in law of making a contract standing *in loco parentis,* acting for the plaintiff who was then a minor, but that it was a contract with the minor himself.

II. But coming to the question of fact in the case, was there sufficient evidence to sustain the plaintiff's allegation, whether it be construed that he was to be

made an heir by adoption or a beneficiary under a will?

There is very little difference, if any, in the views of the learned counsel as to the law of this case. If it was an agreement to adopt the plaintiff, and if there had been such a performance of the contract on his part as to appeal to a court of conscience to enforce it, notwithstanding it was not in writing, the case would fall within the principles of equity jurisprudence announced by this court in Gupton v. Gupton, 47 Mo. 37; Sharkey v. McDermott, 91 Mo. 652; Nowack v. Berger, 133 Mo. 24; Steele v. Steele, 161 Mo. 566; Lynn v. Hockaday, 162 Mo. 111.

But the evidence to establish such a case must be clear and convincing. The trial occurred in 1899 and the two principal witnesses were undertaking to detail a conversation that they had heard more than forty years before when they were themselves not over twelve or fourteen years old. The statement that Andrew McElvain had come to get Esquire Neal to write a letter for him on such a subject, without any explanation or suggestion as to why he should do so, is a very improbable statement coming from any source, but taking into account the youth of the witness at the time, and her illiteracy and the forty years and more that had passed since the occurrence of which she was speaking, the statement was worthless as evidence.

Andrew McElvain, as all the evidence shows, was an intelligent man, capable of writing his own letters and attending to his own business. The idea of going to an esquire to write a letter for one is the suggestion of an illiterate mind, and quite natural to one who, like the witness, could not write.

Whether the plaintiff intends us to believe that the letter Esquire Neal wrote was the letter which the plaintiff's half-brother testified that he so opportunely found and so opportunely destroyed, is not clear.

Here is the letter plaintiff introduced in evidence written by Andrew McElvain to him in 1887:

"Allendale, Mo., Oct. 3, 1887.

"Wm. McElvain, Dear Son:—Your very welcome letter of 28th Aug. was thankfully and gladly received. Was glad to hear you was all in good health. We are in reasonably good health for persons of our age, the friends are in good health as far as I know. Joe is with us yet, Mollie lives in Iowa, Kate still in Kansas, Mag lives in Allenville, Cyrus on the Jasper Cer place, between here and Denver, has a family of nine children. Old man Sam Beavers died in July. Jim Moreland's daughter thirteen years old died since, and Wm. Beaver's wife since that. She leaves a family of five little children about two weeks ago. Ed Hoblet came up here on a visit with his wife from Texas and he took sick and died last week. Your Uncle Jim McElvain and John moved out to Holt county, Nebr., last spring. Andrew and Coma are somewhere in the southwest of Nebraska.

"I will now give you a brief story of our prospects. Our wheat crop was good, oats and hay reasonable fair. Corn prospects was the finest I ever saw until sometime in July the drouth set in and lasted until way in August and then we had only partial showers, and the result is we have only a half crop of corn. Times are the dullest I ever saw. Scarcely any demand for stock of any kind, except No. 1 horses and fat hogs, pork keeps along pretty even from 4 to 4 1-2 cts.

"I hope you are posted on the united labor question and will vote for a government for the people and by the people and let the old parties go to the devil. They are of no earthly use to the people but answer the purpose of politicians to keep the people divided so they can use them for their ruin. Now, William, I will tell you of my misfortune. The Worth County Bank has gone under and has taken several of us with it. I with others vouched to the St. Joseph bank for money to pay debts and settle the thing up and the assets of the concern was locked up in farms, town property and the like with first mortgages over them and everything has depreciated so that we can't get much ready money out of it. I have already paid out near $9,000 and will have to

pay $4,000 more, so you may see that I am worsted badly. The cursed hypocrite Colburn ought to be shot wherever found.

"Andrew McElvain.

"Don't let be so long between times of writing."

Now compare the composition of that letter with the one the witness says he found: "My dear son, says, 'I seat myself to write you a few lines to let you know that I am well and hope this may find you the same.' He says, 'William,' he says, 'I hope now that you may come home and live with me, or make your home with me.' He says, 'If you will come home and make your home with me I'll do the same part by you that I intend to do by the balance of my children.'"

This was the invention of an uneducated mind and when compared with a genuine letter of the alleged writer it disproves itself.

Even if proper foundation had been laid for the introduction of secondary evidence as to the contents of the letter or letters, as the case may be, the testimony is of no probative force. This leaves the proof of the plaintiff's alleged contract hanging on the testimony of one witness alone. The testimony of the woman as to the conversation was that she was at the house of her father on the occasion when Andrew McElvain came and when the contract was made. All that she remembered of what occurred was that as Andrew McElvain was leaving for his home he said, "Well, Willie, you are coming home this evening are you?" and Willie said, "Yes if it is all agreeable," and Uncle Andrew said, "Come ahead." If any such conversation as the other witness testified to occurred, this witness did not hear it or did not remember it. She does not say that Mrs. McElvain, the wife of Andrew, was not there, but that would be the inference from what she does say, because if Mrs. McElvain had been there some reference to her or some remark by her would have been natural when Willie said he would come if it was all agreeable. The main witness who undertook to give more of it

testified that Mrs. McElvain was present and heard the conversation between her husband and the plaintiff. Mrs. McElvain testified that she was never present on such an occasion and never heard such a conversation. But leaving her testimony out of view, the testimony of this witness essaying to recall a conversation more than forty years ago when he was himself, according to his own dates, not over twelve years old, is not that clear, cogent and convincing proof that the law requires to establish a case of this nature.

If the testimony was trustworthy as far as it went it would not be sufficient. The law requires that it should be clear as to what the contract was. This witness leaves to conjecture whether the plaintiff was to be adopted or provided for by will or to be generously treated by Andrew McElvain during his lifetime. He does say that nothing was said about adopting the plaintiff. The character of the evidence vindicates the petition, in one respect. It was impossible for the pleader to make his petition more definite in view of the facts before him without danger of a breach between his *allegata* and his *probata;* therefore, under the circumstances he could plead not otherwise than he did.

Our attention has never been drawn to a case of this nature in which the plaintiff's claim was established by testimony as unsatisfactory as that in this case.

The judgment is reversed and the cause remanded to the circuit court with directions to enter a judgment for defendants dismissing the plaintiff's bill. All concur.