ANNA C. BUCK, Respondent, v. MARTIN T. MEYER, Administrator of the Estate of JOHN H. ASAHL, deceased; E. C. NISCHWITZ, Executor of the Last Will of ANNA MARGARET ASAHL, deceased, Appellant.

Kansas City Court of Appeals, December 18, 1916.

1. EQUITY: Adoption: Contract to Make Heir: Enforcement. A decedent, having no legitimate children, orally promised his natural daughter that if she would remove with her family to America he would adopt her and make her his heir. She agreed and performed her part of the contract. Such contracts, when established according to the standard of proof required and shown to have been performed on one side, are enforceable in equity.

2. ———: ———: ———: Evidence Required. To sustain an oral contract to adopt and make one an heir, the proof must be so clear, cogent and convincing as to leave no reasonable doubt not only that a contract of the general nature alleged was made but that the particular contract as alleged was made.

3. ———: ———: ———: Pleading: Petition. A petition which alleges all the constitutive facts necessary to create a cause of action in equity based upon a contract which would entitle plaintiff to be made a pretermitted, or unmentioned, heir, may be properly regarded as stating an equitable case for that purpose notwithstanding a prayer for judgment in a specific sum, since the court should treat the petition according to its legal effect and give the relief that should follow the establishment of the facts stated.

4. ———: Appellate Practice: Defect of Parties: Executors and Administrators. So far as concerns the personalty of decedent's estate, his administrator represents all who are interested in that. But as to the real estate, since he has nothing to do with that, the devisees are not represented and, not being made parties, the decree is not binding upon them. But since a decree can be rendered without affecting the interest of the devisees in the real estate, the judgment should not be reversed but such a decree should be rendered as can be enforced.

5. ———: ———: ———: Law Governing. Where a contract is made in one State to be performed in another, the essential validity of the contract is governed by the law of the place of performance.

Appeal from Moniteau Circuit Court.—*Hon. J. G. Slate,* Judge.

REVERSED AND REMANDED (*with directions*).

R. M. *Embry* and *S. C. Gill* for appellant.

*Jay L. Oldham* and *Roy L. Kay* for respondent.

TRIMBLE, J.—The petition in this case alleged that plaintiff is a daughter and only child of John H. Asahl, deceased, and was, during his life, always recognized and acknowledged as such; that in 1886 she was living with her family in Mecklenburg Schwerien, Germany, on which date her father visited her and orally promised and agreed that if she would move with her family from Germany to the United States he "would adopt plaintiff as his child and make her his legal heir" that plaintiff accepted said promise and agreement and did in compliance therewith and in reliance thereon, remove her family to the United States and ever since has resided therein; that in order to make said removal she had to dispose of her property in Germany at a sacrifice.

The petition then alleged that said John H. Asahl neglected to adopt plaintiff; that he died in Moniteau county, Missouri, without having made such adoption; that he left surviving him his widow Margaret Asahl, who has since died; that he had no children other than the plaintiff; that at his death he was seized of real estate worth $2000 and of personal property worth $8000; and that plaintiff, under said contract and agreement is entitled to receive and recover one-half of said property. The petition then concludes as follows: "Wherefore plaintiff prays that she may have judgment for the sum, of five thousand dollars and that she may have all other proper relief."

The suit was brought against the adminstrator of John H. Asahl's estate, but afterwards the executor of the will of Margaret Asahl, deceased, on his own motion, was made a party upon a showing by him that John H. Asahl left a will in which he devised and bequeathed all his property to said Margaret Asahl, his second wife.

After the issues were made up, a hearing was had, and the court rendered a decree in which it is stated that the court doth find:

That the plaintiff is an illegitimate and only child of John H. Asahl, deceased; that plaintiff was born in Germany; that said John H. Asahl, deceased left Germany long prior to the year 1886, and came to the United States of America; that in the year 1886, the plaintiff, Anna C. Buck was married and living with her family in Germany; that in the year 1886, John H. Asahl, deceased, left his home in California, Missouri, and went to Germany to locate the plaintiff; and that he found her and visited her and her family in her home in Germany; that during the time of his said visit to plaintiff's home in Germany he, the said John H. Asahl in order to induce plaintiff to move with her family to the United States of America, proposed, promised and agreed to adopt plaintiff and make her his legal heir; that plaintiff relying upon said promise and agreement did with her family move to the United States of America in the year 1887, and has ever since lived therein; that the said John H. Asahl, deceased, during his lifetime failed and neglected to carry out said promise and agreement with plaintiff.''

And the judgment concludes thus:

''Wherefore it is considered, adjudged and decreed by the court that plaintiff be and she is hereby declared a pretermitted heir of John H. Asahl, deceased, and entitled to a share as an heir in the estate of John H. Asahl, deceased,''

Thereupon the executor of the widow's estate appealed to the Supreme Court. That tribunal, however, in an opinion handed down on the 30th of March, 1916, held that jurisdiction of the appeal was with us and transferred the case to this court.

The contract declared on in the petition is an oral contract on the part of John H. Asahl to adopt plaintiff and make her his heir. Such contracts, when established according to the standard of proof required, and shown to have been performed on one side, can be enforced in equity. [Sharkey v. McDermot, 91 Mo. 647; Nowak v. Berger, 133 Mo. 24, 37; Haley v. Simpson, 113 Mo. 340, 346; Lynn v. Hockaday, 162 Mo. 111, 125; Martin v.

Martin , 250 Mo. 539; Thomas v. Maloney, 142 Mo. App. 193, 197; Horton v. Troll, 183 Mo. App. 677, 691,]

In cases of this kind where it is sought to establish an oral contract which, but for the fact of part performance, would be void under the Statute of Frauds, the authorities all hold that "to sustain the alleged oral contract the proof must be so clear, cogent and convincing as to leave no reasonable doubt in the mind of the chancellor, not only that a contract of the general nature alleged was made, but that the particular contract as alleged was made and its terms and conditions clearly shown." [Grantham v. Gossett, 182 Mo. 651; Wales v. Holden, 209 Mo. 552, 558, 576; McElvain v. McElvain, 171 Mo. 244, 251.] Courts must be very careful not to lower the standard of proof in such cases for if that standard be lowered or weakened, the danger of unfounded and trumped up claims being established against a person after his death is very great.

The most important question then, and the one to be first decided, is whether the evidence is sufficient to entitle plaintiff to relief of any nature. For if that be decided adversely to her, all other questions become academic.

There is no question but that John H. Asahl was a native of Germany and emigrated to this country many years prior to 1886. He lived in Moniteau county, Missouri, was married, and at that time his first wife was alive. They had no children. In that year he made a trip to Germany.

Mrs. Willers, witness for plaintiff, testified that she was plaintiff's step-daughter and was born in Mecklenburg, Germany, in 1869; that she was living at home with her father and her step-mother, the plaintiff, in 1886 when John H. Asahl came there from the United States and made them a visit; that he said he came to hunt up his daughter; and that he found her, the plaintiff; that he wanted her to come to the United States and he would adopt her as his heir; that he came to hunt up his child. The witness stated that she herself was then sixteen years old; that she heard the conversations between John

H. Asahl and her step-mother; that one afternoon Mr. Asahl told her father to get the neighborhood school teacher, who was a notary, to come and make out the papers; that when the school teacher came they were all present, Mr. Asahl, the witness, her step-mother and her father; that Mr. Asahl told the teacher that if plaintiff would come over to the United States he would adopt her and make her his heir. The witness says the teacher advised them to let it go until they came to the United States and then make out the papers to adopt her and make her his heir; that this conversation occurred in the living room and that after that she heard it often talked about between them from that time on until Mr. Asahl left. The witness testified that the next year the family came to this country and that the plaintiff came on the promise made to her by Mr. Asahl; that she, the witness, went to live at Mr. Asahl's home and staid there about three years; that while living at his house she heard Mr. and Mrs. Asahl talk about his making the plaintiff his heir, and heard them talk about it a number of times. The witness also stated that she was not present when Mr. Asahl first met her step-mother but that he spoke of Mrs. Buck as his child, called her his daughter, said he was her father, called her his heir and called the children grandchildren.

August Seyffert, a friend of Asahl's testified that he had known him intimately for thirty or forty years, saw him nearly every day; that in 1886 Asahl went to Germany and while there the witness received from him a letter in which he said he had found his daughter and was staying with her; that upon Asahl's return, the witness had heard him say he had found his daughter, but he never heard her name; that he, the witness, never met the plaintiff in the presence of Mr. Asahl and did not know of the latter having held her out and introducing her as his daughter in the town of California where Asahl lived; but in answer to a question by the court as to whether he had ever heard him speak of Anna Buck as his child, or ever heard him say that he brought his child home with him or that she came over here, he re-

plied: "I think I did, and that she moved to Kansas City."

A step-son of plaintiff, Ernest A. Buck, testified that he was born in Germany in February, 1875; that in May, 1886, John H. Asahl came to his father's home in Mecklenburg, Germany; that in a conversation between Mr. Asahl and the plaintiff, Mr. Asahl said he was married over in this country (the U. S.), but that the marriage was childless and that he had come over to adopt her as his daughter and to make her his heir; that the conversation was along the line of adoption papers; that in the afternoon Mr. Asahl sent the witness' father for the school teacher of the place that acted as notary; that the school teacher came and the two, Asahl and the teacher, talked it over; that the old gentleman, Mr. Asahl, said he had property over and was childless, and that she was to come to this country and he would make her his heir; that the teacher told him it wouldn't be necessary to draw up the papers there because they wouldn't be legal over there and that they had better go on this side; that along about the end of July, or the first of August, 1886, Asahl returned to the United States and in the following spring witness' father and step-mother, the plaintiff, came to the United States; that they came on Mr. Asahl's promise to adopt her and make her his heir; that when the family reached Kansas City they were met at the Union Depot by Charles Asahl, John H. Asahl's brother; that witness' father was a carpenter and John H. Asahl had suggested that they come to Kansas City because the town of California wasn't a very good place to follow that business and Kansas City was on a boom; that upon their arrival at Kansas City they called Charles Asahl "Uncle" and his wife "Aunt."

The witness further testified that John H. Asahl came to Kansas City about twice a year to visit them, and usually staid from a week to two or three weeks, never less than a week, dividing his time between their house and that of his brother Charles; that his step-mother went to the town of California to visit Mr. Asahl staying usually a week or ten days; that he was not cer-

tain about the number of times she went; that she went once during the lifetime of Asahl's first wife and twice after he married the second time to his certain knowledge; that she continued her visits up to the time of Mr. Asahl's death and was at his house at the time of his death; that he, the witness, never heard any conversation between plaintiff and Mr. Asahl about adopting her after she came to this country; that the first Mrs. Asahl treated the plaintiff as her own child; that while on a visit to the plaintiff in Kansas City, the first Mrs. Asahl took sick and after an illness of two or three days, died there and was taken to California for burial; that Mr. Asahl remained a widower two or three years; that after his re-marriage, the second Mrs. Asahl treated the family the very opposite of that of the first Mrs. Asahl, and from that time Mr. Asahl's visits were not as frequent as they were before.

The witness further stated that when Mr. Asahl was in Kansas City on a visit to the family, the plaintiff called him "Papa" and the children called him "Grandpa" and that as a rule Mr. Asahl addressed the children by their given names; that he had heard Mr. Asahl introduce the plaintiff as his daughter to his or her friends in Kansas City a dozen different times or more. On cross-examination he said he meant, by introducing her, that Mr. Asahl referred to her as his daughter when talking to other people. The witness said he visited California only once during Mr. Asahl's life and that the latter lived about twenty years after the family came to this country.

On cross-examination the witness said he remembered hearing Mr. Asahl say while on his visit in Germany, that that was his birthplace; that his step-mother, the plaintiff, had never seen her father until he came there; that he learned then from things Mr. Asahl said that it was the same place where he and the plaintiff's mother lived; that the plaintiff's mother had married and was living in the same community and Mr. Asahl went to call on them and the call was returned at the witness' home; that the plaintiff's mother and Mr. Asahl

had a conversation along general lines; and from this conversation the witness learned that they were young people together in that country before he came over here to live, that they lived in the same village; that the witness heard Mr. Asahl in that conversation refer to the plaintiff as his child, but did not hear the plaintiff's mother refer to her as his child.

The foregoing was all the evidence offered by plaintiff. The defendant offered no witnesses in opposition to plaintiff's evidence, but introduced in evidence the will of John H. Asahl and also the will of his second wife, Margaret Asahl.

Asahl's will, after providing for his burial in a decent manner, for the payment of his debts and for a monument at his grave, bequeathed to his wife Margaret Asahl all the remainder of his estate "both real, personal and mixed, including monies, notes and bonds, absolutely and forever after my death to be disposed by her as she shall see fit and proper." No one else was mentioned in his will and no executor was named.

The will of Margaret Asahl bequeathed all of her property to her various relatives and heirs, and appointed the defendant Nischwitz executor with the request that he be not required to give bond. Both wills were introduced in evidence over the objection of plaintiff.

Was the foregoing evidence sufficient to justify the trial court in sustaining plaintiff's claim as to the existence of such a contract and her performance thereof?

In determining this question it is well to ascertain the facts about which there can be no question. They were that John H. Asahl was born and reared in Germany, that he was married but never had had a legitimate child. There can also be no question but that he did go back to Germany and to the scenes of his youth in the year 1886. While there he wrote to his friend Seyffert (a disinterested witness living in or near California, Mo.) that he had found his daughter and was staying with her. Upon his return to America he again

said he had found his daughter. It is practically a conceded fact that *plaintiff is his daughter*. While that concession is not expressly made, yet, in effect, it is conceded, for not a syllable of testimony was offered to dispute that fact, nor was any attempt made in the cross-examination of plaintiff's witnesses to show that she was not his daughter. Seyffert was asked as to whether Asahl held her out or introduced her as his daughter in the town of California, but this did not controvert the fact that she was his daughter as this same witness said Asahl had written him from Germany that he had found his daughter, and upon his return said he had found her but did not mention her name, and the witness said he had heard Asahl afterwards say she had come to this country and had moved to Kansas City.

We think the fact that she was his daughter is very important and, when taken in connection with the other facts about him and the course he pursued, make the alleged contract reasonable and natural. His married life was childless. He went back to the scenes of his youth to hunt up his daughter and found her. He had not only a strong motive, but a moral duty toward her; and his course in hunting her up indicates a desire upon his part to perform that duty. She was the child of his body, and, as said in Roberts v. Roberts, 223. Fed. Rep. 775, 776, "this, together with the conceded fact of his -childless married life, gave to him a natural motive and imposed upon him a moral duty to plaintiff and her mother to make plaintiff his child in law as she was in nature. These two facts enter into all of plaintiff's evidence, giving to it reasonableness and probative force." In the Roberts case direct and express evidence of the contract seemed to be wanting. But the court refused to reverse the judgment on that account, holding that a contract could be found from the conduct of the adopting parents. In the case at bar there is definite and express evidence of the contract and this is corroborated and enforced by everything the father did both before and afterwards, except in the will he made in his second wife's favor in which no mention of a child is made. That the

two witnesses who testified to the contract were young does not destroy the force of their testimony. One was sixteen and the other eleven, but both were capable of being witnesses at that time, and the circumstances were such as to make a deep and lasting impression upon their minds, at a period when such impressions would be indelibly fixed in their memory. The coming of their stepmother's father whom she had never seen, his arrival from a new foreign land on the other side of the earth, the prospect of leaving the home where they were born and of going to that wonderful country where they must learn a new language and live under entirely different surroundings, could not fail to make a deep impress upon their minds. It was the opening of a new epoch and a wonderful vista in their lives, and it is no wonder that they could remember the contract and its terms, especially when we remember the power of youthful memory as to things that make a vital impression. Such testimony standing alone would not be sufficient to establish the contract but when taken in connection with the fact that *plaintiff was his daughter,* that he had no children, that he hunted her up and acknowledged and treated her as his daughter, that from that time he recognized and acknowledged her as such and occupied the position of father and grandfather, the evidence becomes convincing, and comes up to the standard of proof required by the law in such cases.

The contract in this case was to adopt plaintiff and make her his heir; it is not a contract to will her all of his property. Whether Mr. Asahl could by will have cut plaintiff out is not in the case since he did not do so. The case is, therefore, unlike that of Davis v. Hendricks, 99 Mo. 478.

Is the judgment which the court rendered permissible under the petition? It will be noted that the petition alleges all the constitutive facts necessary to create a cause of action in equity based upon a contract which would entitle plaintiff to be made a pretermitted heir. It is true, the petition in one aspect states the violation of a contract and prays judgment for $5000 but just

prior to this the petition states that· the father left an estate of $10,000 and that plaintiff under said contract was entitled to one-half thereof, and, therefore, the prayer is for said one-half or five thousand dollars and that plaintiff "may have all other proper relief." So that it can be readily seen that what plaintiff is seeking is to obtain one-half of the estate *as an heir* and not by way of damages. In fact damages are nowhere mentioned either in the petition or in the evidence. Now, under all the authorities, the enforcement of such contracts is *in equity,* and not by way of damages in a suit at law. In fact, no judgment for damages could be rendered, because, even if such a suit were maintained, the measure of the damages would be the share plaintiff would have as an heir, and that is not known, and, in fact, is not ascertainable in the trial court. It would seem, therefore, that, if the petition can be given any other construction, it should not be regarded as a suit for damages. "Under our practice, if sufficient facts are stated to entitle the party to relief, the conclusions of law the pleader may draw from them, and the particular relief he may ask, may, if necessary, be disregarded, and in such cases the court may grant any relief consistent with the case made by the plaintiff and embraced within the issues." [Sharkey v. McDermott, 91 Mo. 657; Sec. 2100, R. S. 1909.] The court, therefore, could treat the petition according to its legal effect and give the "proper relief" that should follow the establishment of the facts stated.

It is urged that there is a defect of parties since the legatees and devisees of the wife's will are not made parties to the suit. So far as concerns the personalty of Asahl's estate, his administrator represents all who are interested in that, including it would seem, even the estate of the second wife, but, if not, then the *legatees* of the latter are represented by her executor. [1 McQuillen's Mo. Practice, sec. 125; Cromer v. Pinckney, 3 Barb. Ch. 466, 474.] Neither the administrator nor the executor have or had anything to do with the real estate, consequently the wife's *devisees* are not represented, and, not being parties to the suit, their interest *in the*

*real estate* is not affected in any degree. "Where the rights and interests of persons not before the court cannot be materially affected by the final decree, it will not be reversed for the omission to join them as parties." [20 Ency. of Pl. and Pr., 413.] If the situation were such that *no decree whatever* could be rendered without trenching upon or affecting the interests of those not parties to the suit, then the judgment could not be permitted to stand. But since a decree can be made which will not in any manner affect the interests of those owning the real estate, the judgment should not be reversed entirely but such a decree should be rendered as can be enforced. In addition to what is here said, it should be oberved that no mention is made in the motion for new trial of any error by reason of a defect of parties; and appellant is not in position to take advantage of it now. [Breidenstein v. Bartram, 198 Mo. 346.] There seems to have been only a small tract of real estate—the homestead of the Asahls. To reverse and remand the case in order that the devisees of this real estate might be made parties would seem to be unavailing as we surmise, from remarks in the briefs, that the suit is now very likely barred as to them.

The contract is to be determined according to our law and not that of Germany, hence we need not assume that the common law is in force there and determine the case according to its rules. The contract was not complete until it was performed on plaintiff's part by coming to America. It was made by the parties with a view to its performance in this State, no part of it was performed until plaintiff came here, and, in that situation, our courts will supply the applicatory law in its equitable enforcement. [Scudder v. Union National Bank, 91 U. S. 406, 411.] The general rule is that when a contract is made in one state to be performed in another the essential validity of the contract is governed by the law of the place of performance.. [2 Am. & Eng. Ency. of Law (2 Ed.), 1328.]

The plaintiff has not sought to be made an heir to all of the property of her father but only to one-half thereof,

apparently considering and treating his wife as the other heir. As brought, her suit does not affect the interest of those claiming his real estate. Consequently, the judgment should be no greater than she demands, and, as hereinbefore stated, should not be broader in its term than can be enforced. The judgment is, therefore, remanded with directions to modify it so as to make plaintiff a pretermitted, or unmentioned, heir of John H. Asahl, deceased, as to one-half of the personal estate. It is so ordered. The other judges concur.