MUTUAL LIFE INS. CO. OF NEW YORK
v. BENTON et al.

No. 387.

District Court, W. D. Missouri, W. D.

Oct. 1, 1940.

860

Wm. C. Michaels and Henry I. Eager (of Michaels, Blackmar, Newkirk, Eager & Swanson), both of Kansas City, Mo., for plaintiff.

Dickinson & Dickinson, of Kansas City, Mo., for defendant Dollie Kensler.

Cowgill & Popham and Sam Mandell, all of Kansas City, Mo., for defendant Juanita Piatt, executrix.

Flavel Robertson (of Lombardi, Robertson, Fligg & McLean), of Kansas City, Mo., for Carlton R. Benton, guardian, etc.

Lancie L. Watts, of Kansas City, Mo., for defendant Marie Inez Meyer.

REEVES, District Judge.

The question here presented is whether, without a statutory adoption in Rhode Island, a court of equity sitting in Missouri should or could give Marie Inez Meyer the status of an adopted daughter.

The Missouri rule is different from that of practically all the other states as well as the common law. It authorizes a court of equity to enforce a parol contract of adoption, "where the contract has been fully performed by the child and it would be inequitable to deny adoption." Taylor v. Coberly, 327 Mo. 940, loc.cit. 953, 38 S.W.2d 1055, loc.cit. 1060.

It is the contention of the defendant Marie Inez Meyer that in Providence, Rhode Island, in the year 1897 she was adopted by the decedent, Harriett T. Russell, by a parol contract of adoption with

the mother of the said Meyer. As proof of the agreement she claims that thereafter to sundry and divers persons the said Russell stated that the said Marie Inez Meyer was her daughter by adoption. She further claims that the said Russell exercised the authority over and performed the functions of a mother to her.

A vast amount of testimony was heard on the factual question involved. This testimony comprises acts verbal or otherwise spoken or performed in Rhode Island, Connecticut and Missouri. No part of the contract, if made, was performed in Missouri.

The following facts are either admitted to be true or are overwhelmingly established by the evidence:

That the said Meyer was born in Providence, Rhode Island, on October 24, 1891; that she was the daughter of Jeremiah and Rose Carey; that on the next day after she became six years old her father deceased; that she lived with her mother and attended school in Providence a part of each school year up to and including 1902; that she was a prostitute from approximately 1904 to 1909 in a house owned and operated as a bawdy house by her alleged adoptive mother at New London, Connecticut; that in December, 1907, she was at the home of her mother in Providence, and, because of a genital disease, was taken to a hospital in Providence by her mother for a serious operation; that during her convalescence from this operation her mother was taken to the same hospital in a final illness and died on January 16, 1908; that thereafter she returned to New London, where she resumed her trade as a prostitute in the house of her alleged adoptive mother and so continued until June, 1909; that at that time the said Russell out of fear of criminal prosecution for harboring said Meyer in her bawdy house, being of tender years, closed her immoral resort, sold her property and fled to Missouri; that the said Meyer was sent to Nova Scotia by Mrs. Russell, where she remained for six months and then returned to Providence and remained there until June, 1914; that she was then brought to Missouri by her alleged mother and for a brief time made her home with her said alleged parent near Grandview, Missouri.

Mrs. Meyer testified in support of the alleged contract that Mrs. Russell had told her on numerous occasions that she had been adopted by an oral agreement with her mother and that in fact the said Rose Carey was not her natural mother. This, Mrs. Meyer testified, had been corroborated by her mother (Rose Carey). She said that thereafter she addressed her supposedly real mother by her first name, "Rose," and that she was not recognized as the legitimate daughter of her reputed father, Jeremiah Carey, by the sisters of the said Jeremiah Carey.

She was regularly baptised in one of the Catholic Churches in Providence five days after her birth. She was presented for such baptism by Jeremiah Carey and Rose Carey as her parents. The records of the church were offered in evidence and so showed.

She testified that she called Mrs. Russell "Mama" or "Mom", and continued to do so until 1914; that after the marriage of Mrs. Russell who prior to 1905 was Hattie Thayer, she called Galen B. Russell, the husband of Mrs. Thayer, "Papa", and that both of them from time to time introduced her as their child and adopted daughter.

Susan Loveland testified for the claimant that she was an inmate of the bawdy house at New London, Connecticut, from 1906 to 1909 and that Mrs. Russell from time to time said that the claimant was her daughter and that she had adopted her; moreover, that Mrs. Meyer then called Mrs. Russell "Mom" and "Mama." She also testified that the claimant then known as May Carey lived in a different part of the house from that occupied by the other inmates. She remained on the lower floor with her alleged adoptive mother, whereas the inmates had rooms upstairs.

Mrs. Meyer testified that she was rather specially assigned by Mrs. Russell to the better paying and higher priced patrons of the immoral resort. Such assignments were more than ordinarily profitable to Mrs. Russell.

When Mrs. Meyer came to Missouri in 1909 both Mr. and Mrs. Russell admonished her not to refer to either of them in a parental relationship. The reason for this was that both desired to conceal the facts of their past lives. When Mrs. Meyer came to Missouri in 1914 she was then past 22 years old.

It is unnecessary to recount the bits of testimony of sundry witnesses who gave testimony as to expressions from Mrs.

Russell and her husband both in and out of the presence of Mrs. Meyer concerning their relationship to her until their decease. It would unduly prolong this memorandum opinion to review all the evidence taken in a trial lasting for approximately eight days.

Other facts, however, will be stated as such facts may become pertinent in the course of this memorandum opinion.

1. As a preliminary to a consideration of the case a few fundamental principles as postulates should be noted.

■ The relation created by adoption is a statutory status, not a contractual relation. And, in the absence of statutory authority, it is not within the power of an individual to create the relation of parent and child by adoption. 2 C.J.S., Adoption of Children, § 1, p. 368.

■ There is a rule in Missouri, however, to the effect that where the parties have attempted adoption by a parol agreement, then, after its terms have been carried out and fully executed, and particularly by the child, the courts will enforce the adoption contract as an equitable right existing in favor of the child. However, before this can be done, the proof of the oral agreement must be so clear, cogent and convincing as to leave no reasonable doubt in the mind of the chancellor, not only that a contract of the general nature alleged is made, but that the particular contract as alleged was made and its terms and conditions clearly shown. Buck v. Meyer, 195 Mo.App. 287, loc.cit. 290, 190 S.W. 997; Drake v. Drake, 328 Mo. 966, loc.cit. 975, 43 S.W.2d 556, loc.cit. 560.

The reason for the foregoing rule is well stated in Drake v. Drake, supra, as follows: "It has been said that 'on account of the momentous consequences which result from allowing oral evidence to create an heir to a man's property, the courts in this state have uniformly set a guard over uncertain memory and protection against willful falsehood by requiring the proof to be cogent and overwhelming, without substantial ground for reasonable doubt.'"

■ ■ Again, the status of an adopted child and his capacity to inherit are governed by the laws of the forum authorizing the adoption, and it is the general rule that if a contract to adopt is made in one state, to be performed in another, the essential validity of the contract is governed by the law of the place of the performance. Buck v. Meyer, supra.

2. With the above principles in mind a survey should be made of the facts to ascertain whether Mrs. Meyer has established in fact and in law an adoption as asserted by her. No one testified directly in support of a particular contract nor were the terms and conditions of such contract clearly shown as required under the authority of Buck v. Meyer, supra.

In Drake v. Drake, supra, the court said, however, it is "not indispensable that the making of the contract be shown by direct evidence. Such fact may be shown by the acts, conduct, and admissions of the adopting parents."

There was some evidence in the case at bar that there had been a general contract of adoption but the evidence wholly fails to show that there was a particular contract with specified terms and conditions. The evidence on the part of Mrs. Meyer was that when she was six years old, for some reason not explained, Mrs. Russell (then Harriett Thayer) came to Providence, Rhode Island, and made the contract of adoption with her mother. There was an intimation that the then Mrs. Thayer was motivated by a shadowy relationship existing between her and Mrs. Meyer. Such relationship was that she was possibly, or probably, a granddaughter of a sister of Mrs. Thayer. There was no evidence tracing the genealogy so as to support this intimation. Moreover, the evidence was overwhelming and conclusive that Mrs. Meyer was the daughter of Jeremiah and Rose Carey. Five days after her birth she was baptised in one of the Catholic churches at Providence. The records show that she was presented for baptism by her parents. In the presence of a ceremonial so sacred all disguises and pretences would fall away. There isn't even a slight reason why Jeremiah and Rose Carey would present Mrs. Meyer as their infant child for baptism when such was not the fact. Mrs. Meyer in her testimony said that her own mother had intimated a lack of legitimacy in her birth and that Mrs. Thayer had made like statements.

In view of the conclusive proof, these suggestions cast grave doubt on the veracity of Mrs. Meyer. This doubt is augmented by the aspersions she cast upon her own mother's conduct as well as that of her father's relatives. For instance, she says that during the last ten years of her mother's life she was a drunkard. Mrs.

Meyer further testified that Mrs. Thayer (Russell) had taken her away when she was six years old and had at first boarded her out and then later had taken her into Mrs. Russell's bawdy house. She said that the adoption agreement was entered into in 1897, when she was six years old, and yet the school records show that she attended school in Providence until up to and including the school year ending 1902. During that time she lived with her mother. This was five years after she said she had been adopted by Mrs. Thayer (Russell). Moreover, she said she participated in a communion service in the Catholic Church in Providence in 1903. She was sent there by Mrs. Thayer (Russell) for that purpose and Mrs. Thayer had provided her with funds to pay for a certain habiliment requisite for participation in said service. Again this testimony casts doubt upon the issue of an adoption.

At that time, according to Mrs. Meyer, Mrs. Thayer (Russell) had accumulated great wealth. It is a matter of wonderment why, if in fact she had adopted Mrs. Meyer, she would have sent her back to Providence, Rhode Island, for such a ceremonial. Even in that matter Mrs. Meyer intimated that her mother had appropriated to her own use the small pittance Mrs. Thayer had given her to purchase her communion veil. Mrs. Thayer (Russell) appeared several times as a shadowy figure in Providence, whereas she was profitably operating several houses of ill fame at other places and at the time possessed a fortune.

In 1907 Mrs. Meyer returned to Providence and to her mother's home because of a serious illness and the need of immediate surgery. Her affliction had been contracted by reason of her immoral trade carried on in the bawdy house of her alleged adoptive parent. It is to be questioned whether Mrs. Thayer (Russell) as the adoptive parent, living in affluence, would have sent her adopted daughter back to her mother's home in Providence to undergo a serious operation, and particularly since the affliction had arisen from a practice that had been extremely profitable to the alleged adopting parent.

Susan Loveland, who was a prostitute in the bawdy house of Mrs. Thayer from 1906 to 1909, testified that Mrs. Meyer was kept separate and apart from the other prostitutes and that Mrs. Thayer had said to her that Mrs. Meyer, then known as May Carey, had been adopted by her and that she was her child. Admittedly, Mrs. Meyer was then and had been for some time a prostitute and apparently a profitable one to Mrs. Thayer (Russell).

This testimony does not support the theory of a relationship of mother and daughter. Such relationship is a sacred one. The law would not tolerate, nor would it permit the establishment of such a relationship under the circumstances of this case. Equity could only recognize such when the relationship actually measured up to the standards fixed by law, that is to say, that the adoptive parent must act the part of a normal parent. The adopted daughter must perform the functions of a normal devoted daughter. The duties of a daughter do not involve prostitution or other immoral acts committed under the direction, supervision and approval of the parent.

In 1909, when admittedly Mrs. Thayer (Russell) became alarmed over a possible criminal prosecution for harboring Mrs. Meyer as an inmate of her immoral resort, she closed her bawdy houses and fled to Missouri. The adoption of Mrs. Meyer in the manner stated would not have been a defense against a criminal charge. Mrs. Meyer was then 17 years of age. Mrs. Russell sent her to Nova Scotia and did not see her again until long after she had attained her majority in June, 1914. This tends to negative the claim that there was an adoption. The idea is well expressed in Julius Caesar when Portia, the wife of Brutus, said to him: "* * * dwell I but in the suburbs of your good pleasure? If it be no more Portia is Brutus' harlot, not his wife."

The conclusion upon the facts of this case is inescapable that Mrs. Meyer was a harlot or prostitute in the bawdy house of Mrs. Thayer (Russell) and that this was the only relation between them; it was one of mistress and white slave.

3. While, as stated, the facts do not warrant a decree of adoption, yet even if a contract of adoption had been made in Rhode Island, the laws of Missouri would not authorize an equitable decree of adoption. Able and industrious counsel for Mrs. Meyer call attention to the case of Fisher v. Davidson, 271 Mo. 195, loc.cit. 203 and 205, 195 S.W. 1024, 1026, L.R.A. 1917F, 692, as authorizing a decree of

adoption in this state where the contract of adoption was made and executed in another state.

An examination of that case shows that the contract of adoption was made in Kansas when the child or infant was four years old. At the age of 12 years her adoptive parents brought her to Kansas City, where she lived as their daughter until she married in 1904. Able Judge Railey writing for the court pointed out that the laws of Kansas recognize equitable adoptions the same as in Missouri, and, therefore, in his opinion, he relied on the laws of Kansas where the contract was partially executed, and the laws of Missouri where it was completely fulfilled. Judge Railey pointed out that: "The Davidsons performed a part of their agreement, at least, by changing plaintiff's name to that of Davidson, and by introducing her to all their acquaintances as their daughter or adopted daughter, and treating her accordingly. The plaintiff carried out her part of the agreement made in her behalf by living with the Davidsons as their child until her marriage in 1904, and performing such services as a natural child would have performed under the circumstances."

Moreover, in Fisher v. Davidson, supra, the precise terms of the contract of adoption were established by witnesses who were familiar with such terms.

■ In the instant case the alleged contract of adoption was entered into in Rhode Island, and there was no performance whatever in the state of Missouri. Since Rhode Island will not enforce an equitable contract of adoption, the state of Missouri, never having had jurisdiction of the status, would not enforce the contract, unenforceable and forbidden in the state where made.

In the Fisher-Davidson case, supra, Judge Railey was careful to say that the state of Kansas not only did not forbid such a contract, but tolerated and enforced such a contract.

The Supreme Court of Rhode Island, in the case of Batcheller-Durkee v. Batcheller, 39 R.I. 45, loc.cit. 49, 97 A. 378, loc.cit. 379, L.R.A. 1916 E, 545, said: "The statute of adoption in this state creates a status and relationship unknown to the common law. The right of inheritance by the adopted child must therefore be derived from the adoption statute."

Again, in Greene v. Willis, 1926, 47 R.I. 251, 132 A. 545, 546, the Supreme Court of Rhode Island said: "Although a recognized procedure under the civil law, the adoption of children was unknown in the common law * * *. It came into the law of this state solely by virtue of the statute."

■ 4. There is another and a stronger reason why a court of equity would not grant relief in this case, even though it possessed jurisdiction of the alleged status: At the time of the alleged adoption Mrs. Thayer (Russell) was wholly unfit to undertake the nurture and care of Mrs. Meyer, then an infant six years of age. According to Mrs. Meyer, after the alleged adoption she was kept separate and apart from the other inmates of the bawdy house and for a brief period was tenderly cared for. Mrs. Meyer, who appeared as a witness in her own behalf, was very intelligent. In 1904, when she became a profitable prostitute in the immoral resort of Mrs. Thayer, she had reached the age of discretion. She was then 13 years old, and, according to her testimony thoroughly understood the nature and significance of her conduct. She did say that her first venture and illicit relation was while she was under the influence of champagne. This was while on a voyage with a "Captain Fred" in his yacht. She apparently understood, however, that the voyage was for that purpose and that Mrs. Thayer, the madame, was being paid extravagantly for the privilege. All the services thenceforth rendered by her to Mrs. Thayer were in the role and capacity of a prostitute, and not that of a daughter.

In order to grant her equitable relief the Court must find that she performed all her duties as the adopted child of Mrs. Russell. The evidence fails to show one act of a normal and devoted daughter. She was first a maid in a bawdy house. She had a key to the closet where the liquor was stored. She answered the doorbell to admit patrons of the immoral resort. She procured drinks for the patrons. Moreover, the record fails to show one act of Mrs. Thayer (Russell) wherein the devotion and care of a mother was exemplified.

It would be idle to say, in the language of Lindsley v. Patterson, Mo.Sup., 177 S.W. 826, 830, L.R.A.1915F, 680, that Mrs. Meyer "gladly and willingly performed all

of the duties which were due from a loving and devoted daughter to a loving and generous mother." Such language would not apply in the revoltingly sordid situation and environment presented in this trial.

The physical facts as well as the evidence of the actual attitude and relationship of the parties while the alleged contract was being executed and carried out militates strongly against the bits of testimony given by numerous witnesses concerning statements and expressions made by Mrs. Russell and her husband after Mrs. Meyer came to Missouri.

In view of the foregoing it must be found upon the issue as to whether the defendant, Marie Inez Meyer, is the adopted daughter of Harriett T. Russell, deceased, that she was not and that a decree should be entered accordingly.