ALBERT M. AHERN v. FLOY MATTHEWS ET AL., Respondents, and
ANDREW BURTON GALLOWAY WAUGH, Appellant.—85 S. W. (2d)
377.

Division Two, July 11, 1935.

*P. S. Terry* and *Douglas H. Jones* for appellant.

*Barker, Durham & Drury, Albert T. Ennis* and *Edw. T. Eversole* for respondents.

366

COOLEY, C.—This action was brought May 1, 1931, in the Circuit Court of Washington County for the partition of lands located in that county. The petition names nine defendants and alleges that there are unknown persons who derive their claims, if any, from Mary Josephine Waugh (and several others) as heirs, devisees, grantees, etc.

Plaintiff and the nine named defendants claim ownership as collateral heirs of said Mary Josephine Waugh, who died intestate in January, 1930. The cause was sent to the Circuit Court of St. Louis County on change of venue. The appellant, whose name is Andrew Burton Galloway but who is designated in his answer as A. B. Galloway-Waugh, is not named in the petition as a defendant. He asked and was given leave to intervene and be made a party defendant. He filed a pleading, called in the record an answer, alleging in substance that he was sole owner of the lands in question by reason of having been adopted by Mary Josephine and her husband Charles Stewart Waugh and being their only heir, and praying the court so to adjudge. Said answer alleges that the Waughs adopted appellant, but it also states facts designed and tending to show an agreement to adopt and performance thereof such that a court of equity would decree appellant's status to be that of an adopted son and heir upon sufficient proof of the facts. The sufficiency of said answer is not challenged here, so it need not be set out. Plaintiff and one defendant, Wes Matthews, filed a reply to said answer, joining issue upon the allegations thereof and "for themselves, and on behalf of all the other parties hereto, save only the intervening defendant," praying the court to adjudge the title

to the lands in question to be in the plaintiff and the named defendants and that appellant had no interest therein. Plaintiff filed a motion asking the court to hear and determine the issues presented by appellant's said answer first and separately from the issues made as among plaintiff and the other defendants. That motion was sustained and, apparently by consent of all parties, the court proceeded to try the issues so raised by appellant's said answer, in effect as a separate action between appellant on one side and plaintiff and the other defendants, claiming title as tenants in common, on the other. The court found that said Andrew Burton Galloway-Waugh was not the adopted son of said Charles Stewart and Mary Josephine Waugh or either of them, was not the owner of and had no interest in the lands in question and that his claim cast a cloud on the title of the other parties which they were entitled to hav· removed, and rendered judgment accordingly. From that judgment Andrew Burton Galloway-Waugh, after unavailing motion for new trial, appealed.

The only question presented on this appeal, so far as concerns the merits of the case, is the sufficiency of the evidence. Preliminary to consideration of that question, however, we must determine a motion filed by respondents for affirmance of the judgment because of the alleged insufficiency of appellant's abstract of the record.

Appellant's abstract states most of the evidence in narrative form, only a relatively small portion thereof being set out by questions and answers. The gist of respondent's contention as stated in their motion to affirm, is: "That as abstracted the whole of said evidence is not presented to the Court for review as required by the rules of the court and the statute and that its force and effect is not preserved and that while it is set forth in a pretended narrative form it is not in fact a narrative of the testimony, but is rather a condensation of certain portions of the testimony by the appellant and that all or a substantial portion of the force and effect of the evidence as bearing on the credibility of the witnesses is entirely omitted or corrupted and does not appear from said abstract and that many objections made by the respondents going to the admissibility of the evidence are entirely omitted and that substantial portions of the evidence given by the several witnesses is entirely omitted." It is further alleged that the bill of exceptions contains 298 typewritten pages, exclusive of exhibits, besides ninety-eight manuscript pages of depositions, all of which matter is condensed into eighty-eight printed pages in appellant's abstract. The motion then states the names of practically all the witnesses who testified orally at the trial, giving the number of typewritten pages of the bill of exceptions covered by the examination of each and the number of

printed pages of the abstract used in abstracting the testimony of each. The motion does not show what evidence or exhibits it is claimed were omitted. Respondents also filed what they denominate a supplemental abstract of record, which they offer in support of their motion to affirm and also to be considered on the merits of the case "if the court elects to proceed." Respondents say, however, that said supplemental abstract does not present a complete abstract of the bill of exceptions either alone or in conjunction with appellant's abstract. The supplemental abstract is a document of 184 printed pages. It sets out by question and answer the testimony of the witnesses named in respondent's motion to affirm which it is contended is too much abridged in appellant's abstract. Appellant has filed suggestions in opposition to the motion to affirm, denying that he had omitted any evidence and alleging that he reduced the evidence to narrative form as permitted by our Rule 7, preserving its force and effect, in a bona fide effort to comply with our rules and to save the court time and labor in reading the record, for which he says he should not be penalized.

We have compared appellant's abstract and the supplemental abstract with the result that in the former we find no material omissions of evidence. Where the same or substantially the same testimony was repeated one or more times, it is stated once, in narrative form, in appellant's abstract. Objections to evidence and the court's rulings thereon and arguments between counsel relative to proffered evidence are generally omitted, but there is no complaint on this appeal concerning the trial court's rulings in the admission or exclusion of evidence, and no necessity is shown for incorporating such matters in the abstract. It appears that one exhibit, respondents' Exhibit H, which was introduced in evidence, is not copied in the abstract but it is therein stated that said exhibit, except for name and date, is similar to another, appellant's Exhibit 4, which is copied in the abstract, and that is an admitted fact. The name and date in the omitted exhibit are not material in this case. Said Exhibit 4 will be referred to later. The deed showing conveyance of the lands in question to Mr. Waugh and the marriage license of appellant and his wife were introduced. They are not copied in appellant's abstract but are described therein, and there is no controversy as to their contents or legal effect. The facts they show are not disputed and it could throw no light on the question involved in this appeal to have them before us. There were some other exhibits identified but not offered in evidence. The abstract shows the nature of their contents and it is apparent that they could have no bearing on the case. They were properly omitted from the abstract.

Respondents' real complaint regarding the condensation of the testimony in appellant's abstract is that by thus condensing it in-

stead of setting out the material parts thereof by question and answer appellant has failed to present the testimony in such way as to enable this court properly to estimate the credibility of the witnesses and make its own finding of the facts, as it may do in an equity case. In their printed statement constituting part of their brief here respondents say, "As bearing on the credibility of the witnesses respondents have brought up in an indexed volume the testimony of all the witnesses in so far as it relates to their credibility." Thus we have before us all the evidence bearing upon the only controverted question presented on this appeal. We have concluded that under the circumstances we should overrule respondents' motion to affirm for insufficiency of appellant's abstract and determine the case on its merits.

Appellant was born January 9, 1888. About March, 1893, his mother, as his sole natural guardian, surrendered him to the Children's Home Society of Missouri, giving that institution full custody and control of him, with authority to find a home for him and consent to his adoption. The records of the Society show that on December 8, 1897, he was placed with C. S. and M. J. (Charles Stewart and Mary Josephine) Waugh. Under date of April 13, 1898, the following contract, appellant's Exhibit No. 4, was entered into between said Children's Home Society (a corporation) and the Waughs:

"ARTICLES OF AGREEMENT, Made and entered this 13 day of April A. D., 1898, between the CHILDREN'S HOME SOCIETY OF MISSOURI, party of the first part, and C. S. Waugh and Josie Waugh, husband and wife, of Mineral Point, County of Washington and State of Mo. parties of the second part.

"WITNESSETH, That the party of the first part has placed in the care, custody and control of the parties of the second part at their home in Mineral Point, Washington Co., to be trained, loved and educated, so as to be fitted for the requirements of life, a certain male child Andrew B. Galloway by name, said child having been born Jan. 9 A. D., 1888.

"The party of the first part agrees that it will leave said child in the care of the party of the second part so long as they shall love, cherish, nurture, educate and properly care for said child in a suitable and Christian manner, such as they would be expected to do were it their natural child. And the second party hereby acknowledge the receipt of said child, and agree on their part that they will faithfully perform and keep the conditions named above, both in letter and intent.

"And they further agree that they will promptly notify the State Superintendent of the Children's Home Society of Missouri of any change of Post Office or of the death of said Andrew B.

Galloway in case he should die before he is of age and further, that when the child shall have attained the age of 21 years, they will give fifty ($50) dollars in good and lawful money, together with at least two good and sufficient suits of clothing throughout to said Andrew B. Galloway and will allow the said child after he becomes 21 years of age, to go to and from their home, and to enjoy said home as freely and fully as though it was their natural child.

"Provided, however, that, Andrew. B. Galloway the above named child, shall prove himself reasonably faithful to the interest of C. S. Waugh and Josie Waugh until of legal age, and does not leave their home of his own volition. When the above named conditions binding upon the CHILDREN'S HOME SOCIETY OF MISSOURI and C. S. & Josie Waugh shall be complied with, then shall this contract remain in force."

Exhibit II, which we have mentioned above, not copied in appellant's abstract, was found in Mrs. Waugh's effects after her death. It is said to be "exactly similar" to appellant's Exhibit No. 4, except "that it is made to Bessie May Butler, a female child, born November 12th, 1889, dated August 1st, 1903, and provides the same agreement as Exhibit No. 4, signed by the Children's Home Society." It was introduced by respondents for the purpose of showing that Exhibit No. 4 was not intended by the Waughs as an adoption contract, since Bessie May Butler did not remain long in their home and there is no contention that they ever adopted or agreed to adopt her.

The evidence shows without dispute that appellant remained in the Waugh home until about February, 1914, when he was twenty-six years old. Mr. Waugh died in 1904. Mrs. Waugh continued to reside on the farm, appellant remaining with her. He was at all times treated by the Waughs as a member of the family, working upon the farm and about the place and being sent to school and Sunday School and receiving the same care and nurture and rendering the same services as children in similar farm homes in the community. The Waughs had been married five or six years when they took appellant into their home. They were childless and never had children of their own. They became greatly attached to appellant and he to them and he conducted himself toward them as a dutiful, obedient and affectionate son would be expected to do. The evidence indicates no dispute as to these facts. In 1912 appellant married Miss Ella Huff, then aged about sixteen, and for two years thereafter he and his young wife continued to live with "Mother Waugh," he farming part of the place under some rental arrangement with Mrs. Waugh. It may be well to state here that Mr. Waugh left a will, dated June 9, 1900, by which he left his entire estate to his wife, not mentioning appellant. Some time after Mr. Waugh's

death John Matthews, a brother of Mrs. Waugh, moved upon and thereafter farmed part of the Waugh lands. It appears that about April, 1913, there was some disagreement between Matthews and appellant, as a result of which appellant made a settlement of such business matters and farming arrangements as had previously existed among the parties, and appellant gave Mrs. Waugh a receipt reading as follows:—''Received of Mrs. M. J. Waugh the amount in full for all claims against her up to this date, April 13th, 1913.'' At that time Mrs. Waugh gave appellant a check for $132 which his wife testified was for ''some feed.'' The evidence indicates that the total amount for which the receipt was given was $332. Appellant's wife testified that it included her husband's share of a potato crop, ''a cut of saw logs'' and some work, all growing out of the arrangements under which appellant and Matthews were then operating the farm. There is some evidence concerning some papers being served upon appellant about that time. Respondents' witness, Floy Matthews, a daughter of John Matthews, who was about eleven years old at that time, testified that she thought Mrs. Waugh had brought some kind of suit to get appellant off the place. Appellant's wife testified that ''they got Mrs. Waugh'' to sign some kind of papers, she did not know whether a petition in a suit or not; that John Matthews and Mrs. Berryman (a sister of Mrs. Waugh) ''got Mrs. Waugh to move Burt (appellant) out of the house, but Mrs. Waugh did not approve of it and said 'no'; but John Matthews went to Potosi and got Eversole to write up papers and they got Mrs. Waugh to sign, but she was so hysterical she was not really responsible if she signed it.'' It seems that the settlement above mentioned was made after that. There is no evidence that a suit was actually filed. Appellant and his wife left the Waugh home soon thereafter but the exact time of their leaving is not shown except by the testimony of appellant's wife, who said it was in February, 1914. They went to Collinsville, Illinois, where they subsequently resided. Except for the episode just related, there is no evidence indicating that there was ever any rift in the affectionate and harmonious relations that otherwise appear from the evidence always to have existed between appellant and his foster parents.

Six or seven witnesses for appellant, friends and neighbors of the Waughs, who had known and associated with appellant after he came into the Waugh home, testified that they had always heard him called Burt Waugh or Burt Galloway-Waugh, and that he was generally so known in the neighborhood; some said Waugh, others Galloway-Waugh. About an equal number, with equal opportunity to know, testified by deposition for respondents that they had never heard appellant called by any name other than Galloway. It seems clear that appellant's name was not definitely changed to Waugh. A

reason for this fact appears in appellant's evidence. George A. McDonald, a lawyer, who had been consulted by appellant several years before Mrs. Waugh's death, testified that he had gone to Mineral Point and Potosi to make certain investigation of records, had seen Mrs. Waugh and had asked her "Why didn't this boy take your name," to which she had replied, "Well I was an old maid when I got married and if we had given that boy our name after we had adopted him, it would have put him in the illegitimate class and we did not want to cast anything on that name." (Appellant was born several years before the Waughs were married.) Appellant's wife testified that Mrs. Waugh explained to her that the reason she had not had Burt's name changed, "when she would call him Waugh like other people called him Waugh," was that "she was an old maid when she married Mr. Waugh, and he was past a middle-aged man, and they only had been married five years when they got Burt, and Burt was a boy past eight years old, and it would have caused explanations when they were in conversations with people and that would be embarrassing." Appellant was married under the name of Galloway and he and his wife have since used that name.

By the testimony of six or seven witnesses it is shown that both Mr. and Mrs. Waugh repeatedly referred to appellant as their son or their adopted son, and on several occasions so introduced him. Expressions of that kind and others indicating pride in and affection for appellant are testified to as having been made by Mrs. Waugh after appellant and his wife had gone to Collinsville, Illinois. Some testified to having heard Mr. Waugh say, about the time he and his wife took appellant into their home, that he was going to adopt him and later that he had adopted him. In addition to the foregoing there is evidence tending strongly to show that within a very few years after appellant was taken into the Waugh home a deed of adoption was executed by Mr. and Mrs. Waugh, whereby they attempted to adopt and thought they had legally adopted appellant, though that instrument seems not to have been recorded.

Mrs. Edna Huff, a sister-in-law of appellant's wife, testified that she lived in the Waugh neighborhood as a child; that once, after appellant had been there a short while, she went to the Waugh home with her grandmother, who had been called there to stay with Mr. Waugh's aged mother while he and his wife went to town; that she heard Mr. and Mrs. Waugh say they were going to Potosi, the county seat, to have "Burt" legally adopted; that they did go, taking Burt with them; that when they came home that evening Mr. Waugh said to his mother, "We now have Burt adopted and no one can take him away from us, not even his mother if she wanted to or if she tried;" that he handed an envelope with a paper in it to his wife, which she put on a shelf in a corner of the room "where they usually kept their papers and deed and tax receipts, etc." She said

she was about two and a half years older than Burt and thought she was about ten and a half or eleven years old at that time, but the dates of birth of herself and appellant show that she must have been thirteen or fourteen.

Appellant's wife testified that about February, 1925, she visited Mrs. Waugh, at the latter's home, and while there Mrs. Waugh gave her some papers, referring to them as "Burt's papers," with strict injunction to preserve them carefully, saying that she would give them to Burt "but he don't stay at home all the time and therefore I will entrust them to you;" that on her way to her home in Collinsville she examined the papers; that there were three bundles or envelopes of papers, one containing the "church papers" that had been sent to Mrs. Waugh from the "Home," another the "contract" with the Home (Exhibit 4), and the other the "adoption papers;" that the "adoption paper" was not Exhibit 4. She described the adoption paper, its size and appearance; said she could not quote it exactly, but that it contained a provision "to educate and fulfill the duties of a parent to a child" and that "there was some writing in there about in case of other children that should be born to Charles Waugh and Josephine Waugh, they shall share equally alike in all things with said Burton Galloway. That was signed by Mr. and Mrs. Waugh's name, and then there was two witnesses over on the left hand side from that." She did not remember the names of the witnesses. She said that "on down was the Notary Public part of it and with the Notary Public's seal, and then there was Jim Shields' name, Jim Shields with the Notary sign on it, with the Notary seal on it." She testified that when she got home she showed the papers to her mother, Mrs. Sarah Huff, and they and witness's husband examined and read them; that within a few days Mrs. Whaley, Mrs. Donnelly and Mrs. Davis, neighbors and friends, saw and read the adoption paper or deed; that later and several years before the trial of this case she accompanied her husband to St. Louis to consult a lawyer, Mr. McDonald, and that all the papers were turned over to him. Mrs. Donnelly, Mrs. Whaley and Mrs. Huff testified that they saw and read the "adoption paper." They described it, not in the same language but similarly as to substance and effect. Some mentioned details not referred to by others. All said the paper looked old and yellow. One, Mrs. Huff, said the ink was "kind of purple looking ink, I thought like old time pokeberry ink;" that it contained a provision in substance that if children should be born to Mr. and Mrs. Waugh "they should share equal and alike in all things whatsoever." Mrs. Whaley and Mrs. Donnelly also testified that the paper contained a provision in substance that if children should be born to the Waughs such children and appellant should share equally, though they did not use the same language as Mrs. Huff. All of these witnesses said the adoption paper bore the names

of appellant, of Charles or Charles S. and Josephine Waugh as makers, and of James Shields as Notary Public. (It appears from the evidence that Mrs. Waugh was generally called Josephine or Josie and it is conceded that James Shields was then a Notary Public at Potosi.) Mrs. Whaley said that it contained a statement "something in this way: 'This is to certify that I, Charles and Josephine Waugh had adopted Burton Galloway'; something in that way . . . and there was something in regard to that he would equally share, and it was marked by James Shields, that is what his name was on the bottom . . . it was on the paper that he should share as other heirs if there is any other heirs in the family." All those witnesses testified that the "adoption paper" they referred to was not Exhibit 4, which exhibit was shown to them at the trial. Mrs. Whaley and Mrs. Sarah Huff are sisters. Mrs. Donnelly is not related to appellant or his wife. Mrs. Davis, who is said to have read the adoption paper, was dead at the time of the trial, as was James Shields, and their depositions had not been taken.

Mr. McDonald testified that he was and had been for many years a practicing lawyer in St. Louis, and had also, since 1920, served frequently as provisional judge of the Court of Criminal Correction; that appellant, accompanied by his wife, came to his office and consulted him; that they brought and left with him "three papers that I distinctly remember," one of which was an "adoption deed." Mr. McDonald is not of counsel in this case. For some reason not disclosed, appellant employed other counsel to represent him in this action and said counsel sent a messenger to McDonald to get the papers which had been left with him. The papers had been in McDonald's office since having been left there by appellant and his wife. He turned over to the messenger who called for them all of the papers except the "adoption deed" which could not be found. The papers which he surrendered were the "church papers" and the contract called Exhibit 4. They were produced at the trial. The loss of the "adoption deed" was sufficiently accounted for, in the opinion of the trial court, to admit secondary evidence of its contents. As no point is made here on the admission of that evidence the facts authorizing its admission need not be detailed. Mr. Mc Donald described the instrument which he referred to as a deed of adoption, gave its size and general appearance; said that it was a "separate and distinct paper" from Exhibit 4; was "on an ordinary deed of adoption form, a sort of form that is filled in with pen and ink," such as was used at that time; that it set out that "Burt Galloway, A. B. Galloway," was the party described therein; and that it was signed by both Mr. and Mrs. Waugh, but he could not remember whether it was acknowledged or not. He could not remember the first names of the signers,—thought "the old man's name was August or some name like that."

On behalf of respondents, Floy Matthews, a defendant, claiming an interest in the lands as niece and collateral heir of. Mrs. Waugh, testified orally. A part of her testimony, as indicated above, related to the matters involved in the settlement or adjustment made shortly before appellant and his wife left the Waugh home and to the reason for their leaving. She testified further that she was living with Mrs. Waugh at the time appellant's wife claims to have been there and to have received from Mrs. Waugh the papers above mentioned. Her testimony contradicts that of Mrs. Galloway as to that occurrence. Mrs. Galloway testified that Floy Matthews came into the room just after Mrs. Waugh had given her the papers, and to some conversation which then occurred among the three. Miss Matthews not only denied that any such conversation had occurred but said that Mrs. Galloway was not there at all at or near that time. Aside from that of Miss Matthews the testimony of respondents' witnesses was by deposition and tended only to prove that the witnesses had never heard appellant called or referred to by any name other than Galloway. One of them, however, had signed a paper, dated February 3, 1930, before his deposition was taken, in which he stated that he had known appellant since 1896, lived in the neighborhood, and knew that Mr. and Mrs. Waugh held appellant out to everybody as their son "during all the time that I was acquainted with all of the parties."

██ It is well settled that prior to the enactment of our present statute providing for adoption by court proceedings, a court of equity, in a proper case, was authorized to decree an adoption although there had been no statutory adoption. In Drake v. Drake, 328 Mo. 966, 43 S. W. (2d) 556, it was held that such court has that power under the present statute. This case is governed by the old law. ██ The proof of the claim of adoption must be clear, cogent and convincing and of such character as to leave no substantial ground for reasonable doubt. But while the evidence necessary to establish an agreement to adopt or a status of adoption must be of such character it is not indispensable that the making of the contract or agreement be shown by direct evidence. It may be shown by the acts, conduct and admissions of the adopting parents. "If the statements and conduct of the adopting parents are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed, then the agreement may be found as an inference from that evidence." [Drake v. Drake, 328 Mo. 1. c. 975, 43 S. W. (2d) 1. c. 960, and cases cited.]

██ We think the evidence in the instant case fully measures up to the rules above indicated. While, as argued by respondents, this court will defer somewhat to the findings of the chancellor upon conflicting oral evidence because of his opportunity to see and hear

the witnesses, yet we are charged with the duty of making our own finding of the facts in an equity case. There is no substantial conflict in the testimony except as between Mrs. Galloway and Miss Matthews. Both may be said to be interested parties, one the wife of appellant, the other claiming an adverse interest in the land. They dispute each other as to the former having received from Mrs. Waugh the papers relating to appellant's status as and when she claims she received them. But it is clear that Mrs. Galloway or her husband must have received those papers from either Mr. or Mrs. Waugh, because Exhibit 4 and the church papers were produced by them at the trial. The papers all related intimately to appellant and were of a character such that they would naturally be preserved and kept together. The circumstances tend to corroborate Mrs. Galloway. The testimony of respondents' other witnesses is simply that they had not heard appellant called by any other name than Galloway. Respondents assert that all of appellant's witnesses who testified that he had been known as Waugh or Galloway-Waugh prevaricated, as shown by certain testimony of Mrs. Galloway and Mrs. Sarah Huff. We do not find in the testimony of those ladies nor elsewhere in the record a basis for that sweeping charge. Moreover, the fact that appellant's name was not definitely changed is of no great significance in view of the reasonable explanation given for the Waughs not having changed it. Change of name of the child is not necessary to adoption. [Craddock v. Jackson (Mo.), 223 S. W. 924, 930 (6).] There was no attempt made to impeach any of the witnesses. We have carefully examined the evidence as set out in appellant's abstract and also as shown by respondents' supplemental abstract, wherein they say they have set forth, by questions and answers, all the evidence bearing on the credibility of the witnesses. In our judgment there is nothing therein to show lack of veracity on the part of the witnesses or to discredit their testimony. That appellant was treated by the Waughs as though he had been their own child is shown by all the evidence, nor is there room for doubt that he well and faithfully discharged the duties of a child to his foster parents. It is also shown by testimony which we do not doubt that Mr. and Mrs. Waugh repeatedly referred to him as their son, and so introduced him, and that Mr. Waugh said that he had adopted him. Mrs. Waugh in effect also so stated.

Respondents argue that the relations shown to have existed between appellant and the Waughs, his living with and rendering services to them and their care and nurture of him, are referable to the contract with the Children's Home Society, Exhibit 4, which they contend is not an adoption contract. Granting for argument's sake that said contract is not an adoption contract nor evidence of an agreement to adopt, appellant's case does not and need not rest

upon that instrument. Appellant was not permitted to testify. We must look to the testimony of others and to all the circumstances for the facts. In addition to the acts, statements and conduct of the Waughs above referred to, we are convinced that at a time not very long after appellant had been taken into the Waugh home Mr. and Mrs. Waugh executed the instrument referred to in the evidence as a deed of adoption. That some such instrument, indicating not only an intention but an attempt to adopt appellant legally, was executed by Mr. and Mrs. Waugh cannot be doubted unless we disbelieve all of the witnesses who testified on that subject. Five testified to having seen and read that paper:—Mr. McDonald, a lawyer, not interested in this case, Mrs. Donnelly, not interested nor related to appellant, appellant's wife and mother-in-law and Mrs. Galloway's aunt, Mrs. Whaley. The cross-examination of those witnesses developed no inherent weakness or indication of falsehood in their testimony and they were not impeached.

The instrument referred to cannot be given effect as a statutory deed of adoption because not recorded in the county of the makers' residence, as required by the statute then in force. [Sec. 968, R. S. 1889.] But it can and does have evidentiary value. In Kerr v. Smiley (Mo.), 239 S. W. 501, it was held that an instrument in the nature of a deed of adoption but ineffective as a statutory adoption because not recorded in the proper county, was evidentiary of a previous parol agreement to adopt. [See, also, Dillmann v. Davidson (Mo.), 239 S. W. 505 (1, 2).] In this case we think the execution of the so-called deed of adoption has strong significance. Mr. and Mrs. Waugh had already obtained the right to the custody and services of appellant until he should become twenty-one years of age by their contract, Exhibit 4, with the Children's Home Society. If that was all they wanted and intended, why did they thereafter execute the other instrument attempting to adopt him as their son and heir?

Respondents say that an agreement to adopt, to be enforceable in equity, must be based on a substantial consideration, citing Lynn v. Hockaday, 162 Mo. 111, 61 S. W. 885. In that case it was claimed that there had been an agreement to adopt, pursuant to which the child had been taken into the home of the alleged adoptive parents, where she had conducted herself as a dutiful daughter, discharging all her duties as such. This court said, 162 Mo. l. c. 126, 61 S. W. 885: "That she took the place of an only daughter in the lives of Mr. and Mrs. Lynn and performed her part as such, is the cold fact which the law regards as sufficient consideration to support the contract." Other cases to the same effect might be cited and the reasons for such holding elaborated, but it is unnecessary. On the facts of this case there can be no question as to suf-

ficiency of consideration. Appellant has fully performed all that could be required on his part.

After careful consideration of the evidence we are constrained to hold that the finding and decree of the circuit court are wrong and should have been for the appellant.

■ There is another fact that should be noticed in order that a proper judgment may be entered. It appears from the pleadings that during the administration of Mrs. Waugh's estate demands were filed and allowed against said estate in excess of the value of the personalty and that, in order to prevent sale of the real estate for payment of such demands and to protect the interests of the owners, the plaintiff, Ahern, advanced and paid over to the administrator $6536.10, which was so used and for which plaintiff asks reimbursement with interest from date of such advancement and that a lien on the land be adjudged in his favor for the amount due him. Appellant in his answer admits that plaintiff made such advancement "to protect said estate," and is entitled to reimbursement and a lien on the land. That is just and it should be so decreed.

It appears from plaintiff's petition and from certain admissions made at the trial that there is or may be an undivided interest in part of the lands described in the petition which did not descend from either Charles Stewart Waugh or Mary Josephine Waugh, never having been owned by either of them, and which therefore would not belong to appellant as their adopted son. That question was not tried or adjudicated on this trial and the facts relative thereto are not fully developed in the record. We shall not attempt to determine it but leave it for hearing and determination by the circuit court.

For the reasons stated the judgment of the circuit court is reversed and the cause is remanded, with directions to said court to set aside its judgment heretofore entered; to enter a decree adjudging appellant, Andrew Burton Galloway, to be the adopted son and legal heir of Charles Stewart Waugh and of Mary Josephine Waugh and as such the owner of the lands and interests therein described in the petition which descended from said Charles Stewart Waugh and Mary Josephine Waugh or either of them; to award plaintiff, Albert M. Ahern, judgment as against the portions and interests of the land described in the petition belonging to said appellant as such son and heir, but not as a personal judgment against appellant, for said sum of $6536.10, with interest, to be computed by the court, at six per cent per annum from February 6, 1931, the date on which said money is admitted to have been advanced, the amount so determined to be paid within such time and on such conditions as the circuit court shall determine and shall fix, and to declare and adjudge same to be a lien on appellant's said lands and interests; and to proceed,

in accordance with this opinion, with the determination of all unadjudicated issues in the case. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.