ARTHUR H. BENJAMIN v. ETTA MAY CRONAN, Appellant.—93 S. W. (2d) 975.

Division One, April 23, 1936.

*Palmer & Palmer* for appellant.

*Carlin P. Smith, John V. Hill* and *Gordon R. Boyer* for respondent.

BRADLEY, C.—Plaintiff's cause is in equity and is, in effect, to determine title to and to partition certain real property in the city of Sedalia, Missouri. Plaintiff alleges that when a child of tender years he was given into the custody of John L. and Flora Belle Benjamin, husband and wife; that the Benjamins agreed to adopt him; that in pursuance of said agreement the Benjamins gave him their name and "in all their acts and conduct treated him as their son" and that at all times he treated the Benjamins as was becoming to a son; that the Benjamins were the owners by the entirety of the real

property described; that upon their death plaintiff and defendant became seized of said real property as tenants in common, and each entitled to a one-half undivided interest. Plaintiff further alleges that defendant claims that "she is the sole heir" of the Benjamins, when she knew "that the plaintiff is and was an adopted son" of the Benjamins, and it is alleged by plaintiff that the real property in question cannot be partitioned in kind. The prayer of the petition, except as to the partition, is that plaintiff be declared, by the decree of the court, "the legally adopted son and heir". of the Benjamins, and that it be adjudged that plaintiff and defendant are "seized as tenants in common" of said real property.

Defendant answered, except as to some admissions, by general and specific denials and also some affirmative averments. (The Benjamins were childless and it is conceded that defendant was their legally adopted daughter.) Defendant admits that plaintiff was given into the custody of the Benjamins, but denies that they "agreed to adopt plaintiff," and alleges that they "refused to adopt plaintiff as their child;" denies that the Benjamins gave plaintiff their name; admits that the Benjamins, prior to the death of either, owned the real property in question as tenants by the entirety, but denies that plaintiff has any interest in said property. The reply was a general denial. The judgment of the court was, in effect, as prayed in the petition. Unsuccessful on motion for new trial, defendant appealed.

From the decree it appears that the court found "that there was a legal contract of adoption entered into between" the Benjamins and plaintiff and that said contract "was fully, completely and adequately performed" by plaintiff; that plaintiff was and is the legally adopted child and heir at law" of the Benjamins; that upon the death of the Benjamins plaintiff and defendant became "seized as tenants in common" of the real property in question; that the real property concerned was not susceptible to partition in kind. The judgment and decree followed the finding as to plaintiff's interest and the real property was ordered sold and the proceeds, less costs, ordered divided between plaintiff and defendant.

It is stated in the abstract of the record that the findings of the court "were based upon the doctrine of adoption by estoppel," and plaintiff, respondent here, briefs and argues the contention that the petition and evidence are sufficient to support adoption by estoppel. We might say, however, that the petition does not plead estoppel.

Plaintiff was born in Butler County, Missouri, about February 4 or 12, 1891. (Both dates appear in the record.) His parents were named Duvoll. When he was about four or five years old, according to his recollection, he and his brother, Oscar, were placed in the Children's Home Society, St. Louis. According to a contract, hereinafter set out, plaintiff was six years and eight months old when placed in this institution. He was in the institution something like

six months, according to plaintiff, before he was given into the custody of the Benjamins under the contract above referred to, but according to an unexecuted deed of adoption, hereinafter referred to, plaintiff was in the Children's Home Society about one year and three months before he went to the home of the Benjamins.

The Benjamins were well-to-do farmer folk and resided in Pettis County, a few miles southwest of Sedalia, at the time plaintiff went into their home, but later moved to Sedalia. Defendant's natural parents were named Ashby, but after going to the Benjamin home both plaintiff and defendant went under the name of Benjamin until defendant's marriage. Defendant went to the Benjamin home about the time that plaintiff went, but the Benjamins executed a deed of adoption as to her, which was duly recorded, but they did not execute such deed as to plaintiff. Such a deed was sent to them by the Children's Home Society for execution at the same time the deed was sent for the adoption of defendant, but the Benjamins, as stated, did not execute the adoption deed as to plaintiff. They did, later, however, enter into the contract mentioned. The unexecuted deed and the executed contract were both in evidence. The unexecuted deed for the adoption of plaintiff was sent by the Children's Home Society to the Benjamins February 10, 1899, along with a letter from the society. The deed recited that Arthur Duvoll (plaintiff) was born in Butler County, Missouri, on or about February 4, 1891, and that Victoria Duvoll (presumably plaintiff's natural mother) "for good and sufficient reasons did by a lawful instrument of writing entered into on the 4th day of October, A. D. 1897, surrender and deliver said child (plaintiff) to the Children's Home Society of Missouri, . . . conferring upon said society the right to secure for said child a home in a good family on the most favorable terms possible, including legal adoption, indenture and such other conditions as circumstances may make possible or necessary." This unexecuted deed of adoption was dated January 28, 1899, and further recited that the Benjamins "have had the said child for 90 days." Therefore, it would appear that the Benjamins first took plaintiff on trial, so to speak. It appears in the record that prior to the time plaintiff went to the Benjamin home they had a boy from this same society, but this boy was taken back to the society the same day that plaintiff arrived at the Benjamin home. This boy, for reasons not necessary to state, did not prove satisfactory. Also, there is some evidence of still another boy being in the Benjamin home prior to plaintiff's going there, but it is not shown from whom the Benjamins received this third mentioned boy or when he left the Benjamin home.

March 18, 1899, the Children's Home Society sent, along with a letter to John L. Benjamin, the contract above referred to. The inference is that since the Benjamins did not execute the deed of adoption sent to them February 10, 1899, there was negotiation in

some way, which resulted in the contract. The letter of March 18, 1899, to John L. Benjamin is as follows, names, etc., omitted: "Inclosed please find contract in the case of Arthur Duvoll. Please have the paper properly executed and file for record with the recorder of deeds and send us a certified copy or a receipt showing that the paper has been recorded. This we ask in order that we may have something in our office to show what disposition has been made of the child."

The contract signed by the Children's Home Society and the Benjamins is dated March 17, 1899, two days prior to the time it was mailed to the Benjamins, and the contract was signed and acknowledged by the Children's Home Society, March 17, 1899. The contract, omitting signatures, is as follows:

"Articles of Agreement, made and entered this 17th day of March, A. D., 1899, between the Children's Home Society of Missouri, party of the first part, and John L. Benjamin and Flora B. Benjamin, husband and wife, of Sedalia, County of Pettis, and State of Mo., parties of the second part.

"Witnesseth, That the party of the first part has placed in the care, custody and control, of the parties of the second part at their home in Pettis County to be trained, loved and educated, so as to be fitted for the requirements of life, a certain male child, Arthur Duvoll by name, said child having been born February 12, A. D., 1891.

"The party of the first part agrees that it will leave said child in the care of the party of the second part so long as they shall love, cherish, nurture, educate and properly care for said child in a suitable and Christian manner, such as they would be expected to do were it their natural child. And the second party hereby acknowledge the receipt of said child, and agree on their part that they will faithfully perform and keep the conditions named above, both in letter and intent.

"And they further agree that they will promptly notify the state superintendent of the Children's Home Society of Missouri of any change of post office or of the death of said Arthur Duvoll in case he should die before he becomes of age, and further, that when the child shall have attained the age of 21 years, they will give fifty ($50) dollars in good and lawful money, together with at least two good and sufficient suits of clothing throughout to said Arthur Duvoll and will allow the said child after he becomes 21 years of age, to go to and from their home, and to enjoy said home as freely and fully as though it was their natural child.

"Provided, however, that Arthur Duvoll, the above named child, shall prove himself reasonably faithful to the interest of John L. Benjamin and Flora B. Benjamin until of legal age, and does not leave their home of his own volition. When the above named conditions binding upon the Children's Home Society of Missouri and

John L. and Flora B. Benjamin shall be complied with, then shall this contract remain in force."

It does not appear when the Benjamins signed this contract, but the inference is that they did not sign until August 11, 1899, date of their acknowledgment of execution before a justice of the peace. The contract was filed for record in Pettis County, August 24, 1899, and was duly recorded.

From the time that plaintiff entered the Benjamin home he went under the name of Benjamin, as stated, and he says that such was the desire of the Benjamins. He was treated as a natural son and conducted himself towards the Benjamins as a natural son while in this home and after he left it, except for about a year shortly after he left he failed to write, and while in France in the World War he failed to answer a letter. Until he left the home of the Benjamins, plaintiff did the usual chores about the place that would be expected of a natural son and when old enough he worked on the farm. He was amply fed, clothed, looked after, loved and educated by the Benjamins, which training included a course in a business college. He duly appreciated and loved the Benjamins. John. L. Benjamin died December 30, 1926, and Mrs. Benjamin died March 26, 1933. Plaintiff left the Benjamin home about 1911, when he was twenty years old, and married December 23, 1919. After his marriage he and his wife visited the Benjamins and they visited plaintiff and his family. Plaintiff and defendant recognized each other as brother and sister. Plaintiff at the trial said that, until the trial, he did not know "of the existence of these papers," presumably the unexecuted deed of adoption and the contract.

John L. Benjamin executed his will March 7, 1924. In the second clause of the will the testator states that "in order to make permanent provision for my wife, Flora Belle Benjamin, I had the real estate located at Seventh and Washington streets in the city of Sedalia, Missouri, deeded to me and to my said wife jointly, or by the entirety, so that in the event of my death leaving her surviving, she becomes the absolute owner of said property, which I consider to be worth about sixteen thousand ($16,000.00) dollars." The will then devises other real property to the wife for life or while she remained the widow of testator, remainder to defendant. Also certain devises were made to defendant and her five children, but nothing was devised to plaintiff. He was not mentioned. November 29, 1926, about a month prior to the death of John L. Benjamin, he added a codicil to his will by which codicil he devised to plaintiff certain real property "in order to repay my son Arthur the five hundred dollars he advanced to me to pay off the $500 Rennison loan on said property." The real property devised to plaintiff by the codicil was of the value of $3000. Plaintiff was at the home of the testator at the time of the devise by the codicil and explained this devise as follows: "Mr.

Benjamin said to me: 'I want to leave you something,' he says, 'I don't know how I am going to do it,' but he says, 'you come down next Sunday,' which I did and I think it was on either Sunday or Monday and he went upstairs to the bathroom and he called down to me and says, 'Arthur, bring me a pair of pliers upstairs,' so I got the pliers and took them up to him. He says: 'I don't want the pliers.' Now just off the bathroom there was a room in which clothing and things of that kind were stored, he says, 'step in here a moment,' he says, 'I have this house over on Washington, 608 Washington.' 'Now,' he says, 'on this little place up here which goes to your mother, there is a five hundred dollar mortgage that was put on there to pay the paving tax off.' 'Now,' he says, 'if you will pay that off, I will give you this piece of property over on Washington;' so we got in the car and came up and looked at the property. The next day we came down town and we met Mr. Hoffman, Mr. Dimmitt Hoffman's father, on the corner and Mr. Benjamin says to him, 'I want to go upstairs with you and get that will out,' so he went upstairs and Mr. Benjamin told him what he wanted to do, then after that, we went down to Mr. Will Carl's office and I gave him a check for $500 and told Mr. Carl when that check clears, you can mail me the cancelled note and all the papers to it, which he did.''

Flora Belle Benjamin was named executrix of her husband's will, and in her petition to admit the will to probate, she recited, among ''his heirs at law, Arthur H. Benjamin, adopted son.'' This petition was introduced by plaintiff. He also introduced two postcards written by Mrs. Benjamin to plaintiff and his wife, two photographs and a page from an old album. The postcards were written respectively, March 13 and 16, 1933. On the postcards Mrs. Benjamin addressed plaintiff and his wife as ''Dear children'' and signed herself, ''Mamma.'' One of the photographs was a picture of the Benjamin home, Mr. and Mrs. Benjamin, plaintiff and defendant, the hired man and ''the lady visiting there from Ohio.'' The other photograph was a picture of plaintiff and defendant ''shortly after we entered the home.'' The writing in the old album was a childish, sentimental expression written by defendant to plaintiff in 1905, and signed, ''Your sister, Etta Benjamin.''

The facts on which plaintiff relies may be epitomized as follows: (1) The Benjamins took plaintiff into their home when he was a child of tender years; (2) he took their name, with their consent and probably by their direction; (3) they introduced and spoke of plaintiff as their son and loved and treated him as a natural son and he deported himself towards them as a natural son should, except the lapse above mentioned, which was after plaintiff had left the home; (4) in the codicil to his will Mr. Benjamin referred to plaintiff as ''my adopted son;'' (5) in her petition to admit her husband's will to probate, Mrs. Benjamin in setting out the heirs at law of her

husband designated plaintiff as "adopted son;" and (6) Mrs. Benjamin addressed plaintiff and his wife on the postcards as "Dear children" and signed herself "Mamma."

On the other hand, the facts relied upon by defendant may be epitomized thus: (1) The Benjamins refused to execute the formal deed of adoption as to plaintiff; (2) they took plaintiff and defendant into their home about the same time, and executed the formal deed of adoption as to defendant when said deed was presented; (3) March 18, 1899, the Children's Home Society sent to the Benjamins the contract setting out the terms and conditions under which they were to have and retain the custody of plaintiff until he was 21, which contract was executed by them August 11, 1899, and which contract, they fully, completely and adequately performed, except as to the $50 and the clothing, (Also, it appears, as above stated, that plaintiff left the home before he was 21); (4) Mr. Benjamin did not mention plaintiff in his will proper; and (5) he stated specifically in the codicil to the will the reason for the devise therein.

Although plaintiff alleged a contract to adopt, there was no direct evidence of such contract, hence, the reason for the chancellor's finding on the theory of estoppel. Defendant urges that, since estoppel was not pleaded, the judgment cannot rest on such theory, but the view we take of the facts, it is not necessary to rule specifically on that assignment. An oral agreement to adopt is within the Statute of Frauds, Wales v. Holden, 209 Mo. 552, 108 S. W. 89; Drake v. Drake, 328 Mo. 966, 43 S. W. (2d) 556; Kidd v. St. Louis Union Trust Co., 335 Mo. 1029, 74 S. W. (2d) 827, l. c. 831, but, notwithstanding the statutory law relative to adoption of children a court of equity will take the necessary steps "to protect the interest of a child in a case where one has expressly agreed to adopt the child, or by his acts and conduct has placed himself in a position where it would be inequitable to permit him to assert that the child was not adopted." [Drake v. Drake, 328 Mo. 966, 43 S. W. (2d) l. c. 559.] The cases are numerous to this effect and none to the contrary. However, the rule is definite and strict as to the requirements respecting the character and quantum of proof necessary to establish an oral contract to adopt or to establish adoption on the theory of estoppel. This rule, as expressed in numerous cases, is that such evidence must be clear, cogent and convincing and such as to leave no reasonable doubt. [Kay v. Niehaus, 298 Mo. 201, l. c. 205, 249 S. W. 625; Taylor v. Coberly, 327 Mo. 940, 38 S. W. (2d) 1055, l. c. 1060; Gipson v. Owens, 286 Mo. 33, l. c. 49, 226 S. W. 856; Ahern v. Matthews, 337 Mo. 362, 85 S. W. (2d) 377, l. c. 383.] The cases as to this rule are likewise numerous and none to the contrary. In Wales v. Holden, supra (209 Mo. l. c. 558, 108 S. W. 89), it is said: "The circumstances of this case (for specific performance of alleged oral contract to adopt) forcibly illustrates the wisdom of the rule of evidence so

firmly established and so often declared by this court, namely, that the proof to sustain a claim of this kind, in the face of the Statute of Frauds, must be overwhelming in its probative force, leaving no room for reasonable doubt." And, as stated in Kinney v. Murray, 170 Mo. 674, l. c. 700, 71 S. W. 197, "there must be no equivocation or uncertainty in the case." In the present case, as in all such cases, the burden of proof was on plaintiff to establish his case by that character and quantum of proof as required by law. [1 C. J. 1379; Teats v. Flanders, 118 Mo. 660, 24 S. W. 126; McKee v. Higbee, 180 Mo. 263, l. c. 304, 79 S. W. 407.]

It is true that plaintiff, when of tender years, was taken into the Benjamin home, but such is not necessarily consistent only with an agreement to adopt. [Sitton v. Shipp, 65 Mo. 297; Wales v. Holden, supra.] Neither is adoption effected necessarily by recognizing and referring to a child as an adopted child. [1 C. J. 1373, and cases cited in note 34.] Nor will adoption necessarily be effected by the alleged adoptive parent, in an application for life insurance, naming the alleged adopted child as the beneficiary and designating such child as son or daughter, as the case may be. [Lamb v. Feehan (Mo.), 276 S. W. 71, l. c. 80.] In Dillmann v. Davison (Mo.), 239 S. W. 505, it appears that the alleged adoptive parent entered into a written agreement with the natural father of the alleged adopted son, by which agreement the alleged adoptive parent agreed "to instruct the said Clarence Davison in the art of farming. And to have him taught to read and write and the grand rules of arithmetic the compound rules and the rules of three, and the said William R. Moore further covenants and agrees that when the said Clarence Davison shall have arrived at the age of twenty-one years he shall inherit in his the said Wm. R. Moore's Estate share and shall (share) alike with his own children and hereby makes him his legal heir." It was held that such written agreement was evidentiary "of a previous parol agreement between the father of the alleged adopted son and the alleged adoptive parent. But the written agreement in the present case is vastly different than was the agreement in the Davison case.

We do not think, under the facts of the instant cause, plaintiff made out a case that measures up to that character and quantum of proof that the law requires in such cases. The Benjamins evidently took plaintiff into their home on trial, and they refused to execute the deed of adoption sent to them by the Children's Home Society, but did execute the adopting deed sent to them, at the same time, as to defendant. Instead of executing a deed of adoption as to plaintiff, the Benjamins entered into the written agreement with said society which agreement we have set out, supra. By this agreement, said society placed plaintiff in the Benjamin home "to be trained, loved and educated, so as to be fitted for the requirements of life," and the society was to "leave said child" in the Benjamin home only

"so long as they shall love, cherish, nurture, educate and properly care for said child in a suitable and Christian manner, such as they would be expected to do were it their natural child." The Benjamins, by the agreement, acknowledged the reception of plaintiff into their custody and home and agreed to "faithfully perform and keep the conditions named above, both in letter and in spirit." Also, the Benjamins agreed to notify the society of any change in their address or of the death of plaintiff, should such occur prior to the time he became of age, and they agreed that when plaintiff became of age they would give him $50 and two suits of clothes. There were reciprocal promises made by the society on behalf of plaintiff as to his conduct and deportment towards the Benjamins. The promises made by the Benjamins were well kept and abundantly performed, except as to the $50 and the clothes, and this was not a lapse, because plaintiff did not remain with them till he was 21. However, we do not mean to imply that plaintiff went off "in a huff" from the Benjamin home when he was 20 years old. It is not clear as to why he went at that time, but the inference is that his going was agreeable to all concerned and that he went away to secure employment. On the other hand, plaintiff on his part, performed the duties promised by the society which, prior to his relinquishment, had his custody. That is, plaintiff performed except as to the lapses above mentioned, which are not serious under the whole picture here. In his will proper, Mr. Benjamin did not mention plaintiff, but in the codicil he made the devise to him as above stated, designating plaintiff as "my adopted son," and stating in the codicil that the devise was to repay "my said son Arthur," etc., as above stated. The fact that Mr. Benjamin did not mention plaintiff in his will proper is at least a circumstance tending to show that he did not regard plaintiff as his adopted son. The will proper was written 2 years, 9 months and 22 days prior to the writing of the codicil. There was no change in the relations between plaintiff and his family and the Benjamins between these dates. And although plaintiff, without objection, was permitted to testify freely, he did not claim that the Benjamins, or either of them, ever entered into a contract *with him* to adopt him. He, as stated, relies on the course of conduct through the years, and the statements and the holding out to the public by the Benjamins that he was their adopted son. Also, plaintiff was present at the time the codicil was written and he does not say that Mr. Benjamin on that occasion said anything to him about being an adopted son. But this is somewhat beside the issue, because the real property involved here was the property of Mrs. Benjamin at the time of her death, and, if plaintiff prevails, it must be shown that Mrs. Benjamin adopted him. There is nothing in the record to show that Mrs. Benjamin considered plaintiff her adopted son that is not common to both Mr. and Mrs. Benjamin (eliminating the codicil circumstance). The fact that Mrs.

Benjamin in her petition to probate her husband's will, named plaintiff as the adopted son of her husband, is by no means satisfying that she regarded him as *her* adopted son. In view of the undisputed fact that the Benjamins refused to adopt plaintiff when he first went to their home and especially in view of the contract which the Benjamins did execute and have recorded, we do not regard the whole of the circumstances tending to show adoption by the Benjamins or either of them as sufficient to meet that character and quantum of proof necessary to establish oral adoption or to support the theory of adoption by estoppel. We shall not enter upon the subject of estoppel. The term is sometimes used in cases like the one here. This case is to be distinguished on the facts from Ahern v. Matthews, supra. In that case the alleged adopted son came in 1898, from the same Children's Home Society as did plaintiff. The contract or agreement in that case between the society and the alleged adoptive parents is identical in terms with the contract here. In that case adoption was ordered decreed by this court (Division Two), but not on the theory that the contract and the conduct of the parties justified a finding of oral adoption or on the theory of estoppel, but the direction went because of satisfactory evidence that the alleged adoptive parents actually executed a deed of adoption, which was lost.

We might again call attention to the wisdom of the rule as to the character and quantum of proof required to support oral adoption, or to support adoption by estoppel, as it is sometimes termed. If this rule is relaxed, then couples, childless or not, will be reluctant to take into their homes orphan children, and for the welfare of such children, as well as for other reasons, the rule should be kept and observed. No one, after he or she has passed on, should be adjudged to have adopted a child, unless the evidence is clear, cogent and convincing so as to leave no reasonable doubt. In a very recent adoption case in this court (Division Two), Furman et al. v. St. Louis Union Trust Company, 338 Mo. 884, 92 S. W. (2d) 726, the court, quoting from Buck v. Meyer, 195 Mo. App. 287, 190 S. W. 997, said: "Courts must be very careful not to lower the standard of proof in such cases, for, if that standard be lowered or weakened, the danger of unfounded and trumped-up claims being established against a person after his death is very great."

It is our conclusion that the evidence in the present case is not sufficient to support adoption on any theory, and we so rule. It follows, therefore, that the judgment should be reversed and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.